**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Guy GIOVANNETTI and Nicholas Janis, Defendants–Appellants.**

**Nos. 89–3651, 89–3678.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 18, 1990.

Decided Dec. 5, 1990.

---

David E. Bindi, James O'Connell, and Barry R. Elden, Asst. U.S. Attys., Office of U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Edward M. Genson, Marc W. Martin, Genson, Steinback & Gillespie, Chicago, Ill., for defendant-appellant Nicholas Janis.

Marc W. Martin, Genson, Steinback & Gillespie, James A. Graham, Chicago, Ill., for defendant-appellant Guy Giovannetti.

Before POSNER, RIPPLE and MANION, Circuit Judges.

POSNER, Circuit Judge.

The government indicted fifteen men for offenses arising from their participation in an illegal gambling enterprise. Twelve of the defendants pleaded guilty, another absconded, and the remaining two, who are the appellants before us, went to trial and were convicted. Guy Giovannetti was convicted of racketeering (18 U.S.C. §§ 1962(c), (d)), conducting an illegal gambling business (18 U.S.C. § 1955) or aiding and abetting the conducting of such a business (18 U.S.C. § 2), and making false statements to federal agents (18 U.S.C. § 1001). He was sentenced to a total of 45 months in prison. Nicholas Janis was convicted of conducting an illegal gambling business or aiding and abetting its conducting, and was sentenced to 60 days.

The head of the gambling enterprise was Thomas Orlando, one of the defendants who pleaded guilty. Active primarily in Bridgeview and other southwestern suburbs of Chicago between 1978 and 1987, the enterprise operated a succession of "wirerooms," where bets on various sporting events were accepted over the telephone, and it also sponsored "smokers," or casino gambling nights, held at restaurants and bars, where guests played blackjack, craps, and poker. Giovannetti, and particularly Janis, had minor roles in the enterprise. Giovannetti was a bouncer, enforcer, and strong-arm collector of gambling debts owed the enterprise. Janis owned a house that the enterprise for a time used as its wireroom.

The evidence against Giovannetti was strong and the trial rulings of which he complains plainly correct, so we shall move directly to Janis's appeal, which raises some difficult questions. Janis was a gambler and knew members of the Orlando organization, including Orlando himself and Richard Merino, a bookmaker for the organization. Together with a real estate agent who has not been charged with any wrongdoing, Janis owned, as an investment, a lot in Bridgeview with two houses on it, one behind the other. In the fall of 1982, Merino, who unbeknownst to Janis was a government informant, went to Janis and said he wanted to rent the smaller of the houses, the one in the rear, for his friend Pluta, who was recently divorced. This was done. Pluta did not move in until the spring of the next year (1983), but from November 1982 until July 1983 the house was in continuous use as a wireroom, operated first (it appears) by Merino and then, after Pluta moved in, by Pluta. The house was not used in the gambling enterprise after that, but early the following year the government tape-recorded a telephone conversation between Janis and Orlando in which Janis offered Orlando a key to the house and asked him whether everything was all right. Orlando responded: "Yeah, yeah, they just wanted to get out of there. They spotted some guys out there I guess." Janis replied: "I know." Although Merino and then Pluta were the nominal tenants, often the rent was paid not by either of them but instead by Michael Gioringo, whom Janis knew to be an aide to Thomas Orlando.

The only other evidence of Janis's participation in the gambling enterprise was the testimony of a former friend and fellow gambler, Edward Arnold. Arnold testified that Janis had told him late in 1982 or early in 1983 that he had rented a house in Bridgeview to an acquaintance of Tommy Orlando or Richard Merino. Arnold further testified that shortly after this conversation the phone number that the Orlando enterprise had given him to use in calling in bets was changed to a number that he recognized as a "southwest side" number, an area that, as he knew, included Bridgeview. On the basis of the conversation and the phone number Arnold testified that "in my opinion it was possible that bets were being taken out of that house ... that Nick was renting."

Janis argues that Arnold's testimony was impermissible opinion evidence, and irrelevant to boot. It was neither impermissible nor even opinion evidence. Rule 701 of the Federal Rules of Evidence permits a lay witness to offer an opinion or inference that is rationally based on the witness's perceptions and that is helpful to the development of the evidence at trial. The rule is a sensible elaboration of Rule 602, which requires that a lay witness's testimony be based on personal knowledge. All knowledge is inferential, and the combined effect of Rules 602 and 701 is to recognize this epistemological verity but at the same time to prevent the piling of inference upon inference to the point where testimony ceases to be reliable. *Western Industries, Inc. v. Newcor Canada Ltd.*, 739 F.2d 1198, 1202–03 (7th Cir.1984); see also *Kaczmarek v. Allied Chemical Corp.*, 836 F.2d 1055, 1060 (7th Cir.1987); 3 Weinstein & Berger, Weinstein's Evidence ¶ 701[01] (1987). That point was not even approached here. Arnold was being asked whether the facts that he knew, which were facts equally known to Janis, who was also a customer of the Orlando enterprise (in fact Janis had introduced Arnold to it)—or rather were facts *better* known to Janis than to Arnold because Janis owned the house—had tipped off Arnold to the fact that the house was being used as a wireroom. What Arnold called his "opinion" was actually a report of the contents of his mind, of which people are normally assumed—whether correctly or not, it does not matter—to have direct rather than inferential knowledge. The admission of such testimony is not problematic.

The character of Arnold's testimony as personal knowledge, not opinion, would have been transparent if the prosecutor had first asked him whether he had suspected that the house in Bridgeview was being used for a wireroom, and after he said yes had followed up with questions about the basis of that suspicion. That sequence would have made clear that Arnold was not being asked to draw an inference for the jury's benefit—to formulate an opinion in litigation—but rather to explain the basis on which he had drawn an inference in the past. That basis lay in facts known equally or better to Janis, and it could be assumed therefore that Janis probably had drawn the same inference. The jury could not peer into Janis's mind. It had to infer his knowledge from circumstances, one of which was that Arnold had concluded from facts known to Janis that Janis's house was being used as a wireroom. Of course Arnold may have been sharper or more alert or more savvy than Janis, but this is just to say that the evidence was not conclusive with regard to Janis's knowledge; it was relevant, however, and therefore admissible. *United States v. Guzzino*, 810 F.2d 687, 699 (7th Cir.1987).

Another way to grasp the true character of Arnold's so-called "opinion" evidence is to note that the question on which he might have been said to offer an opinion was not in dispute: namely whether Janis's house had been used as a wireroom. The purpose of calling Arnold was not to elicit testimony on a matter not in dispute but to explore the process by which he had reasoned to this conclusion and to ask the jury to infer that Janis had reasoned similarly to the same conclusion and therefore knew that his house was being used in the gambling enterprise.

Reference to Janis's knowledge brings us to the central issue in the case, the propriety of the judge's having given the "ostrich" instruction, on which see the thorough discussion in *United States v. Jewell*, 532 F.2d 697 (9th Cir.1976) (en banc). The instruction told the jury, "You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear that he would learn, you may conclude that he acted knowingly." There is no quarrel with the wording of the instruction, which is verbatim the instruction that we recommended to the district judges of this circuit in *United States v. Ramsey*, 785 F.2d 184, 190 (7th Cir.1986); the question is whether it should have been given.

The ultimate question that the jury had to decide was whether Janis either had participated in conducting the Orlando gambling enterprise or, more plausibly, had aided and abetted the enterprise, by renting the house to Merino knowing it would be used as a wireroom. Now it is not the law that every time a seller sells something that he knows will be used for an illegal purpose he is guilty of aiding and abetting, let alone of actual participation in the illegal conduct. Aiding and abetting requires more, *United States v. Pino–Perez*, 870 F.2d 1230, 1235 (7th Cir.1989) (en banc); in Learned Hand's words, requires that the alleged aider and abettor "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938). A stationer who sells an address book to a woman whom he knows to be a prostitute is not an aider and abettor. Perkins & Boyce, Criminal Law 747 (3d ed. 1982). He can hardly be said to be seeking by his action to make her venture succeed, since the transaction has very little to do with that success and his livelihood will not be affected appreciably by whether her venture succeeds or fails. And, what may well be the same point seen from another angle, punishing him would not reduce the amount of prostitution—the prostitute, at an infinitesimal cost in added inconvenience, would simply shop for address books among stationers who did not know her trade.

But Janis concedes that the rental of a house for gambling purposes is the type of assistance that brings the supplier within the field of the aider and abettor concept, provided that the landlord (Janis) knew what use his tenant (Merino) intended to put the rented house to. The reason for this concession may be that it would be difficult to conceal the purpose of such a rental from the landlord. If a gambling enterprise to succeed needs to enlist a landlord who knows the purpose of the rental, punishing him will make life significantly more difficult for the enterprise. This prospect makes it easier to defend the im-

position of aider and abettor liability than it was in our hypothetical example of the prostitute's purchase of an address book.

The tape-recorded conversation from which we quoted earlier makes clear that Janis learned of the house's use as a wireroom eventually, but possibly only after that use had ceased. It is true that he offered Orlando the key so that it could be reopened as a wireroom, but he was never taken up on his offer (perhaps because the FBI shut down Orlando's enterprise three weeks later) and the wireroom never was reopened in his house. There is considerable doubt whether that rather empty gesture of offering the key could be thought to aid and abet the enterprise—it sounds more like attempted aiding and abetting, a crime that the American Law Institute thinks should exist, Model Penal Code § 2.06(3)(a)(ii), but that probably does not exist under federal law because of the interpretation that the courts place on aiding and abetting, *United States v. Powell*, 806 F.2d 1421, 1424 (9th Cir.1986); *United States v. Barnett*, 667 F.2d 835, 841–42 (9th Cir.1982), combined with the absence of a general federal attempt statute. A critical question, therefore, was whether Janis knew when he rented the house that it was destined for use as a wireroom. There was no direct evidence of his knowledge, but that was not necessary, and certainly it would have been proper to instruct the jury to this effect. The jury could have inferred from Arnold's testimony and the recorded conversation with Orlando that Janis had known what use the rented house would be put to.

It is not the purpose of the ostrich instruction to tell the jury that it does not need direct evidence of guilty knowledge in order to find such knowledge beyond a reasonable doubt. Still less is it to enable conviction of one who merely suspects that he may be involved with wrongdoers. At times during the oral argument of this appeal the government's able lawyer came close to suggesting that the proper office of the ostrich instruction is to enable conviction upon the basis of constructive notice—if a reasonable man who knew what

Janis knew would have inquired further and discovered the illegal activity, Janis is an aider and abettor. Not so. Aider and abettor liability is not negligence liability. The abettor and aider must know that he is assisting an illegal activity. We add that if it were the purpose of the ostrich instruction to enable conviction for mere negligence, the instruction would be worded differently.

■ The most powerful criticism of the ostrich instruction is, precisely, that its tendency is to allow juries to convict upon a finding of negligence for crimes that require intent. *United States v. Ramsey*, *supra*, 785 F.2d at 190; Robbins, *The Ostrich Instruction: Deliberate Ignorance as a Criminal Mens Rea*, 81 J.Crim.L. & Criminology 191 (1990). The criticism can be deflected by thinking carefully about just what it is that real ostriches do (or at least are popularly supposed to do). They do not just fail to follow through on their suspicions of bad things. They are not merely *careless* birds. They bury their heads in the sand so that they will not see or hear bad things. They *deliberately* avoid acquiring unpleasant knowledge. The ostrich instruction is designed for cases in which there is evidence that the defendant, knowing or strongly suspecting that he is involved in shady dealings, takes steps to make sure that he does not acquire full or exact knowledge of the nature and extent of those dealings. A deliberate effort to avoid guilty knowledge is all the guilty knowledge the law requires. *United States v. Josefik*, 753 F.2d 585, 589 (7th Cir.1985). "[T]o know, and to want not to know because one suspects, may be, if not the same state of mind, the same degree of fault." *AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.*, 896 F.2d 1035, 1042 (7th Cir.1990). See also *United States v. Kehm*, 799 F.2d 354, 362 (7th Cir.1986). A good example of a case in which the ostrich instruction was properly given is *United States v. Diaz*, 864 F.2d 544, 550 (7th Cir. 1988). The defendant, a drug trafficker, sought "to insulate himself from the actual drug transaction so that he could deny knowledge of it," which he did sometimes by absenting himself from the scene of the actual delivery and sometimes by pretending to be fussing under the hood of his car.

The government points out that the rented house in Bridgeview was a short way down a side street from the thoroughfare on which Janis commuted to work daily. It would have been easy for him to drive by the house from time to time to see what was doing, and if he had done so he might have discovered its use as a wireroom. He did not do so. But this is not the active avoidance with which the ostrich doctrine is concerned. It would be if the house had been *on* the thoroughfare, and Janis, fearful of what he would see if he drove past it, altered his commuting route to avoid it. Janis failed to display curiosity, but he did nothing to prevent the truth from being communicated to him. He did not *act* to avoid learning the truth.

■ The critical question so far as Janis's guilt or innocence was concerned is simple (to pose, not necessarily to answer): what did Janis know? Did he know that he was renting his house for use as a wireroom, or did he believe that he was renting his house to the Orlando crew for some private purpose of theirs unconnected with gambling? (Even criminals have private lives.) The ostrich instruction did not advance this inquiry; it confused it, by pointing the jury to circumstances of deliberate avoidance of knowledge that did not exist. As we said in *United States v. Bigelow*, 914 F.2d 966, 971 (7th Cir.1990), when the facts require the jury to make a "binary choice" between "actual knowledge" and "complete innocence," the ostrich instruction should not be given. See also *United States v. Alvarado*, 838 F.2d 311, 315–16 (9th Cir.1988).

The true intermediate case between a clearly proper giving of the ostrich instruction because the defendant did physical acts to insulate himself from knowledge, as in *Diaz*, and the clearly improper giving of the instruction because the only issue is the defendant's actual knowledge or complete ignorance, is the case of purely psychological avoidance. *Josefik* was such a case. "It is inconceivable that Josefik did not

believe that the scotch was stolen, and in context all the challenged instruction [the ostrich instruction] meant is that he could not get off the hook simply by resolutely refusing to find out for sure whether it was stolen." 753 F.2d at 589. In other words, the deliberate effort to avoid guilty knowledge that we said is all the guilty knowledge the law requires can be a mental, as well as a physical, effort—a cutting off of one's normal curiosity by an effort of will. There is no evidence of either sort of effort here.

■ The error in giving the ostrich instruction in this case may have been harmless, since there was plenty of evidence that Janis knew, when he rented the house, what it would be used for. But the government does not argue that if there was error in giving the ostrich instruction the error was harmless, and by not arguing harmless error it has waived the point.

■ Although we think it was an error to give the ostrich instruction in this case, we do not agree with the further suggestion that such an instruction has no possible place in an aider and abettor case. It is true that to be guilty the alleged aider and abettor must want to make the principal's venture succeed, which may seem to imply that he must know what that venture is. But we think not, for the reasons stated in *United States v. Kehm, supra,* 799 F.2d at 362, in rejecting the parallel argument that the ostrich instruction should never be given in a conspiracy case. We have already given an example, based on the facts of this case, of how an aider and abettor can be an ostrich. If Janis strongly suspected that his house was being used as a wireroom, *and* to avoid confirming his suspicions he expended resources on avoiding a confrontation with the facts (as by taking a circuitous route to work), then his actions, far from showing that he was not an aider and abettor under Judge Hand's formulation, would show that he was—would show that he wanted the gambling enterprise to succeed so badly that he expended time and effort to avoid acquiring proof of the enterprise's character and with it indisputably guilty knowledge that might compel him to

withdraw for fear of being prosecuted with no chance of avoiding conviction by pleading ignorance of what the enterprise was up to.

We need to discuss one last issue, because it is certain to recur at the new trial: whether Janis was entitled to have the jury instructed on the statute of limitations. He was indicted more than the statutory period after the house he had rented to Merino and Pluta ceased being used for gambling purposes. The government persuaded the district judge that this did not matter, for two reasons: the telephone conversation with Orlando at which Janis offered him the key occurred within the statutory period; and the gambling enterprise itself lasted into the statutory period.

■ The first reason is unsound because it was a question for the jury whether the offer of the key was an act either of aiding and abetting or of actually conducting the gambling enterprise. The offer was not accepted, so did not actually aid the enterprise, and we have already expressed our considerable skepticism that attempting to aid and abet is a federal crime. It is not much more plausible to picture the unaccepted offer of the key as the "conducting" of a gambling enterprise, though a lot of the things done in any enterprise miscarry, and perhaps Janis's futile offer of the key to his house could be seen as one of them. (Perhaps by the same token the offer could be viewed as aiding and abetting—not just attempting to aid and abet—the conducting of the gambling enterprise, after all.) In any event the jury should have been asked whether the offer of the key was a culpable act, and directed to acquit Janis if it was not—unless, perhaps, to come to the government's second point, the participant in the conducting of an illegal gambling enterprise is to be equated to a coconspirator. The gambling enterprise was a conspiracy and did continue into the statutory period, but Janis was charged not as a conspirator but (so far as relevant here) as a participant in the conducting of an illegal gambling enterprise. The acts of a conspirator are attributed to the other conspirators, unless and until the others by an

affirmative act of withdrawal, of which there is no suggestion in this case, terminate their participation in the conspiracy. *United States v. Patel,* 879 F.2d 292 (7th Cir.1989); *United States v. Borelli,* 336 F.2d 376, 388–89 (2d Cir.1964).

■ Is there a similar rule for coparticipants in an illegal enterprise—"co-schemers," as the government calls them? Or for aiders and abettors? But how does one withdraw from an agreement that one is not a party to? For you can be an aider and abettor of an offense without being a co-conspirator of the principal offender, if for example you assist the offender without having agreed to do so—he might not even be aware of your assistance. *United States v. Krogstad,* 576 F.2d 22, 29 (3d Cir.1978). It would not follow that your liability for his acts would be as extensive as if there had been a conspiracy, *United States v. Blitz,* 533 F.2d 1329, 1346–47 (2d Cir.1976)—though there is plenty of authority that it would. *United States v. Sellers,* 483 F.2d 37, 45 (5th Cir.1973), and cases cited there.

The government's only response to these conundra has been to cite three cases (two in its brief, one at oral argument), without disclosing that these are conspiracy cases rather than cases involving either the conducting of an illegal enterprise or aiding and abetting. A litigant who fails to press a point by supporting it with *pertinent* authority, or by showing why it is a good point despite a lack of supporting authority or in the face of contrary authority, forfeits the point. *Bob Willow Motors, Inc. v. General Motors Corp.,* 872 F.2d 788, 795 (7th Cir.1989); Fed.R.App.P. 28(a)(4). We will not do his research for him. *Sanchez v. Miller,* 792 F.2d 694, 703 (7th Cir.1986). The principles of waiver apply to the government in criminal cases as much as to a private party in civil litigation. *United States v. Malin,* 908 F.2d 163, 167 (7th Cir.1990); *United States v. Woods,* 888 F.2d 653, 654 (10th Cir.1989); cf. *Thomas v. Indiana,* 910 F.2d 1413, 1415 (7th Cir. 1990). We would not, in a case to which no previous cases were pertinent, consider a litigant to have waived his challenge mere-

ly because he had cited cases that were not on point; for it is the rare lawyer who will acknowledge that he has no cases to cite. But having found no *cases* on point the government could still have given us *reasons* for extending the conspiracy cases to cases of aiding and abetting or of conducting an illegal enterprise. The government's submission is limited to three cases that do not stand for what the government claims they stand for. That is not enough to preserve the point. Janis is entitled on retrial to a statute of limitations instruction.

He also questions the denial of his motion to sever his case from Giovannetti's, but the issue is moot because the new trial that we are ordering will have but one defendant: Janis. To summarize, then, Giovannetti's conviction is affirmed, but Janis's conviction is reversed and the case is remanded for a new trial for him in conformity with the principles set forth in this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.