**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert BLANKENSHIP and Thomas E.
Lawrence, Defendants–Appellants.**

**Nos. 90–2686, 90–3116, and 91–3624.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 7, 1992.

Decided July 21, 1992.

Rodger A. Heaton (argued), Patrick Kelley, Asst. U.S. Attys., Springfield, Ill., for plaintiff-appellee.

Walter H. Kasten (argued), Springfield, Ill., for defendant-appellant Lawrence.

Timothy E. Duggan (argued), Springfield, Ill., for defendant-appellant Blankenship.

Before POSNER and EASTERBROOK, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

Courts do not enforce bargains among the producers of illegal drugs, or between these producers and their customers. Extra-judicial remedies tend to be violent, which makes drug running a crime of the young and vigorous. Substitutes for both legal processes and brutality are possible, however; family ties may suffice. Nancy Nietupski, a grandmother in her early 60s, ran a methamphetamine ring through her extended family. She started on the west coast, working with her nephew William Zahm. Later she moved to her sister's farm in Illinois. While sister Violet Blankenship supplied a base of operations, nephew Robert Blankenship helped distribute the drug and collect debts.

Nietupski initially bought methamphetamine from outside sources. When these proved unreliable, Zahm helped her enter the manufacturing end of the business. "Cooking" methamphetamine is messy, and there is a risk of explosion when volatile chemicals such as acetone reach high temperatures. Nietupski and Zahm moved their laboratory frequently, to reduce the risk of detection. In February 1989 Zahm leased from Thomas Lawrence a house trailer in which to set up shop for a day. Nietupski told Lawrence what Zahm planned to make and offered $1,000 or one ounce of methamphetamine; Lawrence preferred the cash and took $100 as a down payment. He covered the floor of the trailer with plastic for protection. Zahm postponed the operation when he could not find a heating control. A few days later Lawrence got cold feet, telling Marvin Bland (one of Nietupski's assistants) that he wanted chemicals and equipment removed. Bland complied.

Zahm soon joined William Worker to set up a new methamphetamine ring. Agents of the DEA infiltrated the Zahm–Worker clique. Zahm cut his losses by turning against his aunt, whose operations collapsed. Eighteen persons from the Nietupski ring were indicted. Robert Blankenship, Thomas Lawrence, and six others were in one group, all charged in a single count with conspiring to manufacture and distribute methamphetamine. 21 U.S.C. § 846. Of the six, three pleaded guilty and three were acquitted. Blankenship and Lawrence, convicted by the jury, received identical sentences of 120 months' imprisonment plus five years' supervised release.

Blankenship was in Nietupski's enterprise up to his neck, the jury could conclude. Only one of his contentions requires comment. His mother called David Spencer as an expert about the properties of methamphetamine. Spencer volunteered that in clinical trials users cannot distinguish methamphetamine from cocaine. The district judge tolerated Spencer's excursion into this prejudicial subject, and after the lawyers had their fill the judge continued the questioning. His curiosity piqued, the judge asked Dr. Spencer to explain the similarities in chemistry and effects between cocaine and methamphetamine. On being told that methamphetamine and cocaine have "very similar" neurological effects, the judge exclaimed: "So if, for instance, the war on drugs were successful as far as cocaine is concerned, and if cocaine were eliminated, its place could easily be taken by chemically produced, artificially produced methamphetamine?" Spencer replied: "This is precisely what is going on".

Robert Blankenship did not object to this exchange, which is not plain error given the strength of the evidence against him and the tangential subject matter of the colloquy. Still, we trust that such episodes will not recur. The jury's task was to determine whether Blankenship joined the Nietupski organization, not whether methamphetamine is the scourge of the earth. It is hard enough to be a defendant in a drug case without having the judge refer to a "war on drugs" and remind the jury that if the Coast Guard seals the borders against cocaine, labs in the United States will manufacture a close substitute. Criminal trials should be limited to the charges laid against the defendants; they are not apt occasions for inquiries into the sociology and chemistry of drugs. A judge should slake his curiosity out of the jury's hearing.

■ Lawrence has filed two appeals, one from his sentence and the second from an order denying his motion under Fed. R.Crim.P. 33 for a new trial. The district judge thought that Lawrence's appeal deprived him of jurisdiction to hear this motion. That conclusion is mistaken. Although a court may not grant a new trial while an appeal is pending, it may entertain the motion and either deny it or, if inclined to grant a new trial, so certify to the court of appeals. *United States v. Cronic*, 466 U.S. 648, 667 n. 42, 104 S.Ct. 2039, 2051 n. 42, 80 L.Ed.2d 657 (1984); *United States v. Ellison*, 557 F.2d 128, 131–32 (7th Cir. 1977). As things turn out, the district court's error is not important.

■ Conspiracy is agreement to violate the law. *United States v. Sassi*, 966 F.2d 283 (7th Cir.1992). Unless Lawrence willingly joined the Nietupski venture, he did not commit the crime of conspiracy. What evidence was there that Lawrence knew, let alone joined? Nietupski and Zahm told Lawrence what they planned to do in his trailer; Zahm and Lawrence sampled some of the product scraped off the apparatus; for $1,000 he furnished the space, covered the floor with plastic, supplied refreshments, and let Zahm take a shower to wash some acid off his legs. If providing assistance to a criminal organization were the same thing as conspiracy, then Lawrence would be guilty. Yet there is a difference between supplying goods to a syndicate and joining it, just as there is a difference between selling goods and being an employee of the buyer. Cargill sells malt and barley to Anheuser Busch, knowing that they will be made into beer, without being part of Busch; by parallel reasoning, someone who sells sugar to a bootlegger knowing the use that will be made of that staple is not thereby a conspirator, *United States v. Falcone*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940), and someone who buys one load of marijuana has not conspired with the sellers, *United States v. Baker*, 905 F.2d 1100, 1106–07 (7th Cir.1990).

*Falcone* illustrates the doctrine that "mere" sellers and buyers are not automatically conspirators. If it were otherwise, companies that sold cellular phones to teenage punks who have no use for them other than to set up drug deals would be in trouble, and many legitimate businesses would be required to monitor their customers' activities. Cf. *People v. Lauria*, 251

Cal.App.2d 471, 59 Cal.Rptr. 628 (1967) (answering service furnished to prostitute). Yet this does not get us very far, for no rule says that a supplier *cannot* join a conspiracy through which the product is put to an unlawful end. *Direct Sales Co. v. United States,* 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943), makes that point in holding that the jury may infer that a pharmaceutical house selling huge quantities of morphine to a physician over a seven-year span conspired with the physician to distribute the drug illegally.

Where does the "mere" sale end, the conspiracy begin? One may draw a line, as *Falcone* and *Direct Sales* did, between knowledge of other persons' crimes and intent to join them, but this restates the elements of the offense without telling us when an inference of intent to join is permissible. Selling a camera to a spy does not make one a traitor—but selling camera and film, developing the prints, enlarging the detail in the critical areas, and collecting half of the payment for the secret information would assuredly land one in prison. Stating polar cases is easy, but locating the line of demarcation is hard. Courts have a tendency in these situations to draw up a list of relevant factors, without describing necessary or sufficient conditions. Lists have burgeoned since *Falcone.* See Wayne R. LaFave & Austin W. Scott, Jr., 2 *Substantive Criminal Law* § 6.4(e)(3) (1986) (culling nine factors from the cases and implying that others might be pertinent); cf. Glanville Williams, *Criminal Law: The General Part* § 124 (2d ed. 1961) (discussing related developments in the United Kingdom).

When writing for the court of appeals in *Falcone,* 109 F.2d 579 (2d Cir.1940), Learned Hand concluded that a supplier joins a venture only if his fortunes rise or fall with the venture's, so that he gains by its success. Judge Hand offered a similar definition of aiding and abetting in *United States v. Peoni,* 100 F.2d 401 (2d Cir.1938), and we adopted his approach in *United States v. Pino–Perez,* 870 F.2d 1230, 1235 (7th Cir.1989) (in banc). On this view the sale of a staple commodity such as sugar or telephone service does not enlist the seller in the criminal venture; in a competitive market the vendor could sell to someone else at the market price, and the buyer could turn to other sources. Anonymous transactions are the norm in markets and do not create criminal liability; when the seller has knowledge but the terms remain the same, there is no reason to infer participation in the enterprise any more than in the Cargill–Busch case we have given. Although the Supreme Court did not discuss this approach in *Falcone,* we have been favorably disposed in *Pino–Perez* and, e.g., *United States v. Giovannetti,* 919 F.2d 1223, 1227 (7th Cir.1990). See also *Model Penal Code* § 2.06(3)(a) and commentary at 315–16 (1985) (supplier culpable only if he has "the purpose of promoting or facilitating" the crime). Cf. *Ackerman v. Schwartz,* 947 F.2d 841 (7th Cir.1991); *DiLeo v. Ernst & Young,* 901 F.2d 624 (7th Cir.1990), adopting a similar approach to aiding and abetting in civil cases.

Trailers do not rent for $1,000 per week—not in legitimate markets, anyway. By charging a premium price, Lawrence seemingly threw in his lot with the Nietupski operation and may be convicted under Judge Hand's approach. Yet the price cannot be the end of things. What does the $1,000 represent: a piece of the action, or only a premium for the risks? Lawrence bore two. One was that the chemicals would damage his trailer. Although he took precautions by spreading plastic on the floor, an explosion would have spattered chemicals on the walls and ceiling. Lawrence would have charged for taking this risk even if the manufacture of methamphetamine were entirely legal. The other risk was the hazard of criminal liability, a cost of doing business. One who covers his own costs and no more does not share in the venture's success. Using a price calculated by reference to the risk of criminal conviction as support *for* that conviction would be circular. Reduce the risk of conviction, and you reduce the price. Either way, the price responds to the legal system rather than to the potential profits of the Nietupski gang and does not establish a desire to promote its success. *Re-*

*peat* business, as in *Direct Sales,* might show such a desire, but Lawrence did not carry through with the initial transaction and never realized even the $1,000.

*Giovannetti* and other cases from this court, e.g., *United States v. Fountain,* 768 F.2d 790, 798 (7th Cir.1985), speak reverentially of Judge Hand but actually ask a different, and more functional, question. It is whether the imposition of liability on transactions of the class depicted by the case would deter crime without adding unduly to the costs of legitimate transactions. So, we observed in *Giovannetti,* "[a] stationer who sells an address book to a woman whom he knows to be a prostitute is not an aider and abettor. Perkins & Boyce, Criminal Law 747 (3d ed. 1982). He can hardly be said to be seeking by his action to make her venture succeed, since the transaction has very little to do with that success and his livelihood will not be affected appreciably by whether her venture succeeds or fails. And, what may well be the same point seen from another angle, punishing him would not reduce the amount of prostitution—the prostitute, at an infinitesimal cost in added inconvenience, would simply shop for address books among stationers who did not know her trade." 919 F.2d at 1227. Treating the stationer as an accomplice would, however, raise the costs of legitimate business, for it would either turn sellers into snoops (lest they sell to the wrong customers) or lead them to hire blind clerks (lest they learn too much about their customers); either way, the costs of business would rise, and honest customers would pay more.

If the product is itself contraband—for example, the methamphetamine Nietupski bought in California early on—the analysis differs but the result is the same: an isolated sale is not the same thing as enlisting in the venture. A sale of methamphetamine is a substantive crime. Because the substance is illegal, the seller knows that the buyer will put the drug to an illegal use, yet this does not make the sale a second, inchoate offense. To treat it as a second crime of aiding and abetting (or conspiring with) the buyer is to multiply the criminal punishment and so distort the

penalty system the legislature adopted— for what is the point of setting at five years the maximum penalty for selling a given quantity of methamphetamine if every sale violates a second law and doubles the penalty? As we held in *Pino–Perez,* a long course of sales may permit a finding of conspiracy or aiding and abetting, for such conduct is both more dangerous (it is harder to ferret out crime when the criminals have a closed circle of suppliers) and more likely that the vendor's welfare is bound up with that of the organization to which he sells. *Direct Sales,* 319 U.S. at 713, 63 S.Ct. at 1270. So too with "fronting" of drugs, a credit arrangement in which the parties to the sale share the profits.

Sometimes a single transaction extends over a substantial period and is the equivalent of enduring supply. *Giovannetti* involved premises leased for the purpose of illegal gambling (a "wire room"). Periodic payments of rent link the landlord with the criminal enterprise. Because a lessor almost inevitably knows his tenant's business, the imposition of a criminal penalty is likely to deter but not to raise the costs of legitimate transactions. A bookie needs a wire room; if the law deters landlords from providing space for these operations, it will substantially cut down on crime.

Does *Giovannetti* describe Lawrence's situation? Not quite; Lawrence negotiated for one payment, not a stream of rentals. What is more, it remains necessary to identify just what crime a long-term supplier such as a landlord commits. We supposed in *Giovannetti* that the crime was aiding and abetting the operation of the wire room at the leased premises, just as the Supreme Court concluded in *Direct Sales* that the crime was a conspiracy between Direct Sales Company and John V. Tate to distribute the narcotics Dr. Tate ordered. Suppose the bookie operated not one wire room but 50, one in each ward of Chicago; suppose Dr. Tate bought morphine sulfate from nine distributors in addition to Direct Sales. Would the owner be criminally responsible for all 50 wire rooms, or Direct Sales for the quantities

procured from its competitors? A landlord's offense is not the greater if his customer operates additional wire rooms, and a seller of opiates should not be subjected to additional punishment if it cuts down on supplies, forcing its customer to shop elsewhere.

Some states have statutes forbidding "criminal facilitation," an apt description of Lawrence's acts. E.g., N.Y.Penal Code § 115.05.* Lawrence agreed to facilitate the manufacture of methamphetamine, but the United States Code lacks a facilitation statute. It does forbid aiding and abetting substantive offenses. Although Zahm did not complete the "cook," 21 U.S.C. § 846 forbids attempted violations of other drug laws. Yet the prosecutor did not charge Lawrence with assisting this offense—or with assisting a conspiracy to make methamphetamine on his premises. Instead the prosecutor not only selected the conspiracy component of § 846 but also lumped Lawrence with a single, overarching conspiracy, the entire Nietupski venture. Neither joining nor abetting this whole conspiracy is an appropriate description of Lawrence's fling.

In charging Lawrence with joining the Nietupski conspiracy, the prosecutor sought to hold him responsible for that organization's entire activities, just as if the landlord were to be punished for all 50 wire rooms, or Direct Sales for the drugs Dr. Tate had to scrounge from its rivals. Members of conspiracies may be punished for all of the crimes within the scope of the venture. *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *United States v. Martinez de Ortiz*, 907 F.2d 629, 635 (7th Cir.1990) (in banc). The Sentencing Guidelines, when coupled with the sky-high punishments authorized for drug crimes, produce the same vicarious liability without the bother of obtaining convictions. In a drug case the court must impose a sentence computed by reference to all "acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction". U.S.S.G. § 1B1.3(a)(2). See *United States v. White*, 888 F.2d 490 (7th Cir.1989). When the "offense of conviction" is a conspiracy, this means counting the full sales of the criminal enterprise throughout its duration. Thus Robert Blankenship, who was a cog of the Nietupski organization from the time his aunt moved to Illinois, and Thomas Lawrence, who obtained $100 by opening his trailer to a single failed "cook," received identical sentences—ten years in prison without possibility of parole.

Neither *Direct Sales* nor any of this court's cases permits a supplier to a criminal organization to be sentenced for *all* of that organization's sins when he facilitated only one. If the United States Code contained a facilitation statute along the lines of New York's, Lawrence would receive a sentence proportioned to his own iniquity rather than that of Nietupski and her henchmen. So too if the Code penalized abetting criminal attempts. But it does not, and if the only options are conspiracy, with full responsibility for all of the venture's other crimes, and no crime, then no crime comes much closer to describing Lawrence's responsibility. Although the guidelines permit a reduction of four levels for marginal figures such as Lawrence, a sentence based on the sales of the full organization, less 30% (the effect of a four-level reduction), still vastly overstates the culpability of persons who supply goods and services to criminals.

Let us be clear: we do not hold that in reforming criminal sentences Congress altered the definition of conspiracy. We come to the same conclusion as the Supreme Court did in *Falcone*. Lawrence knew what Zahm wanted to do in the trail-

---

* "A person is guilty of criminal facilitation in the second degree when, believing it probable that he is rendering aid to a person who intends to commit a class A felony, he engages in conduct which provides such person with means or opportunity for the commission thereof and which in fact aids such person to commit such class A felony. Criminal facilitation in the second degree is a class C felony." Note the difference in degree between the principal and the facilitator, appropriate to the different roles but not achievable when conspiracy or aiding and abetting supplies the theory of responsibility.

er, but there is a gulf between knowledge and conspiracy. *United States v. Townsend,* 924 F.2d 1385, 1392–93 (7th Cir.1991). There is no evidence that Lawrence recognized, let alone that he joined and promoted, the full scope of the Nietupski organization's activities. He may have joined, or abetted, a more limited agreement to manufacture a quantity of methamphetamine, but he was not charged with that offense. Lawrence facilitated an attempted crime, and probably conspired to do this, but he did not subscribe to the broader agreement on which his conviction depends.

On Lawrence's appeal No. 90–3116 the judgment is reversed. His appeal No. 91–3624 is dismissed as redundant under the circumstances. On Blankenship's appeal, the judgment is affirmed.