In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-2110

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MONIQUE S. BOWLING,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:16-cr-00153-PPS-JEM-1 — **Philip P. Simon**, *Judge.*

ARGUED FEBRUARY 27, 2020 — DECIDED MARCH 10, 2020

Before BRENNAN, SCUDDER, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Monique Bowling purchased over
$1.3 million worth of computer equipment on the City of
Gary, Indiana's vendor accounts and then sold the devices for
cash, leaving the city to foot the bill. This all occurred at a time
when the City of Gary was already in dire financial condition.
The grand jury returned an indictment against Bowling for
theft from a local government that received federal funds,
18 U.S.C. § 666. A jury convicted Bowling of the charge and

the district court sentenced her to 63 months in prison. On appeal, Bowling contends that the district court lacked subject-matter jurisdiction, abused its discretion in admitting certain testimony, and erred in enhancing her sentence for obstructing justice through her malingering. We affirm the conviction and sentence.

## I

Bowling worked for the City of Gary, Indiana for almost twenty-five years. By all accounts, Bowling was a model employee for almost the entirety of her tenure with the city. She started out as a secretary in 1991 and worked her way up to the position of a network administrator, the second-ranking employee in Gary's IT department. As a network administrator, Bowling had access to the city's computer network and email system, and in addition to resolving IT issues, one of her job responsibilities included ordering computer equipment for the city. Though she had the authority to place orders on the city's credit accounts with vendors, she did not have the ability to make payments. The authority to approve and pay vendors rested solely with the city's controller.

## A

In May 2013, Bowling began ordering new Apple products from CDW, one of the city's technology vendors, seemingly for the city. The purchases started off small, only one to two devices at a time. Over time, however, she grew bolder, and after a year or so, Bowling was ordering up to fifty devices at a time. By April 2015, she had ordered 1,517 Apple products from CDW, as well as Best Buy and Verizon. In all, Bowling's purchases totaled $1,337,114.06.

Almost all of Bowling's orders were for Apple iPads, though she also purchased about fifty MacBooks, one iMac, and one iPod Touch. She sold the iPads and MacBooks for cash, typically $500 to $600 for the iPads and $700 for the Mac-Books. She sometimes traded them for other items of value as well. Her sales were so widespread that the products ended up all over the world, with at least one device being registered on every continent except Antarctica.

To conceal her scheme, Bowling submitted duplicate CDW invoices from legitimate purchases for payment. This flow of money successfully kept the city's credit lines open for a time. But as her orders grew in size and frequency, the fraudulent purchases far outstripped the duplicate invoices she could process for payment and the balance ballooned. As the debt continued to pile up and exceeded one million dollars, CDW froze the city's account and turned it over to one of its senior recovery analysts, Vida Krug. Once an account is turned over to her, Ms. Krug will deal strictly with mayors, comptrollers, CEOs, CFOs, and the like, that have the direct authority to make or release payments. Thus, Ms. Krug first reached out to Gary's mayor and left a message explaining that the city had quite a large debt it owed to CDW. Ms. Krug then spoke to Celita Green, the city's controller. Ms. Green was unaware that the city owed such a large amount to CDW and asked for copies of all the outstanding invoices. Ms. Krug sent the invoices via FedEx, but the package never made it to Ms. Green; Bowling had intercepted it when it arrived at city hall, signing for the package using a fake name. The FedEx receipt was later found in Bowling's desk.

In another effort to forestall her inevitable downfall, Bowling accessed Ms. Green's email account and sent a fabricated

message to Ms. Krug to reassure CDW that everything was all right with the city's credit account. The email explained that the city was experiencing a "cash flow issue" but that Ms. Green had directed Bowling to "process more payments" and that Ms. Green and Bowling were going to work together to "resolve the outstanding balances on this account." Ms. Krug did not believe that Ms. Green actually sent the email because it was inconsistent with their telephone conversation and riddled with grammatical errors. The email was later recovered from Ms. Green's deleted folder.

Bowling's scheme quickly unraveled, and the city soon terminated her as a result of the city's and the state police's investigations.

**B**

A grand jury indicted Bowling on six fraud-related counts. She first went to trial on one count of theft from a local government that received federal funds, 18 U.S.C. § 666, and after that trial and conviction, the government dismissed the remaining counts with prejudice.

Three weeks before trial was scheduled to begin, Bowling's counsel moved to continue the trial date because he had been unable to communicate with Bowling. According to defense counsel, Bowling's husband informed him that Bowling had been "unable to speak for approximately six months and that her family provides for her basic needs." Thus, counsel moved for a hearing to determine Bowling's mental competency to stand trial and requested a court-ordered psychological examination pursuant to 18 U.S.C. § 4241. The district court granted the motion and ordered Bowling to undergo an

in-custody psychological evaluation within a Bureau of Prisons facility.

Bowling was committed to the Federal Medical Center in Carswell, Texas (FMC Carswell), for the examination. Dr. Amor Correa, a licensed forensic psychologist, evaluated Bowling over an approximately two-month period. Dr. Correa diagnosed Bowling as malingering. The "essential feature" of malingering, Dr. Correa explained, is the "intentional production of false or grossly exaggerated symptoms, motivated by external incentive and not attributable to a mental disorder." *See also* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 726–27 (5th ed. 2013). One such external incentive is "evading criminal prosecution." *Id*. at 726. In Dr. Correa's professional opinion, Bowling was competent to stand trial.

The district court held a competency hearing, at which Dr. Correa testified. Based on Dr. Correa's forensic psychology report and testimony, the court found that Bowling was competent to stand trial.

## C

The case proceeded to a three-day jury trial on the charge of theft from a local government that received federal funds under 18 U.S.C. § 666(a)(1)(A). To convict Bowling of this offense, the government had to prove the following elements: (1) Bowling was an agent of the City of Gary; (2) she knowingly stole or obtained by fraud property; (3) the property she stole was owned by or under the care, custody, or control of the City of Gary; (4) the property had a value of $5,000 or more; and (5) the City of Gary, in any one-year period, received more than $10,000 in federal funds. *See United States v.*

*Abu-Shawish*, 507 F.3d 550, 556 (7th Cir. 2007); 18 U.S.C. § 666(a)(1)(A), (b). At the beginning of the third day of trial, the parties stipulated to the following fact regarding the receipt of federal funds: "[T]he City of Gary, Indiana received more than $10,000 in federal benefits and funding between April 1, 2014 and April 1, 2015."

The evidence at trial was overwhelming and largely uncontroverted. The government presented testimony from seventeen witnesses, including Ms. Green, Ms. Krug, and several purchasers of the iPads. Bowling did not testify and did not present any witnesses. The jury deliberated for just under one hour before returning a guilty verdict.

At sentencing, the probation office recommended a two-level sentencing enhancement for obstruction of justice based on Bowling's malingering, or having "faked mental illness," which "caused the trial to be delayed for a year." Bowling objected and introduced testimony from Dr. Robert Coyle, a neuropsychologist who examined Bowling about four months after trial. Dr. Coyle opined that Bowling was not malingering at the time of his evaluation, but also testified that he thought that Bowling was just misdiagnosed at FMC Carswell. Notably, however, after the trial concluded, Bowling was able to provide verbal answers to both the probation officer and Dr. Coyle.

The district court overruled Bowling's objection to the obstruction of justice enhancement. The judge found by a preponderance of evidence that Bowling's "conduct was obstructive in nature such that it unnecessarily and unduly prolonged these proceedings." With the two-level obstruction of justice enhancement, Bowling's total offense level was 26 and

her criminal history category was I, which resulted in a Guidelines range of 63 to 78 months.

The district court sentenced Bowling to 63 months' imprisonment, the low end of her advisory range, and ordered her to pay restitution totaling $1,386,430.28.

## II

Bowling presents three issues on appeal. At the threshold, Bowling argues that the district court lacked subject-matter jurisdiction over her case and that the court should dismiss it. Failing that, Bowling challenges the admission of a single line of testimony at trial and the two-level obstruction of justice sentencing enhancement.

## A

We can easily dispose of Bowling's jurisdictional challenge. Section 666 prohibits theft from an organization, local government, or agency that receives funds under a federal assistance program. 18 U.S.C. § 666(a)(1)(A). The so-called federal-funds element of § 666 requires that "the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program." *Id*. § 666(b). The relevant local government here is the City of Gary, not, as Bowling suggests, the discrete IT department. And she stipulated that Gary received more than $10,000 in federal funds in one-year. Bowling argues, however, that the IT department specifically did not receive any federal funds and that the lack of an affirmative connection between the charged theft and the federal funds renders a federal court without jurisdiction.

But the district court's subject-matter jurisdiction is supplied by 18 U.S.C. § 3231, not 18 U.S.C. § 666. "The district

courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." 18 U.S.C. § 3231. Bowling was indicted for violating a federal criminal statute, an offense against the laws of the United States. The district court's jurisdiction was secure. *See United States v. Grossi*, 143 F.3d 348, 351 (7th Cir. 1998).

Any failure of proof on the federal-funds element goes to the merits, not the district court's authority to hear the case. Bowling, though, assures us that she is not challenging either the indictment or the sufficiency of the evidence as to the federal-funds element. So this issue need not detain us.

We note that, however she characterizes it, any argument that the government must establish an affirmative connection between the theft and federal funds has been repeatedly and squarely rejected. *See, e.g.*, *Sabri v. United States*, 541 U.S. 600, 605 (2004) ("readily dispos[ing]" of the position that "the statute must require proof of connection with federal money as an element of the offense"); *Salinas v. United States*, 522 U.S. 52, 56–57 (1997) (finding the "expansive, unqualified language" of § 666 "does not support the interpretation that federal funds must be affected to violate" the statute); *id*. at 57 ("The prohibition is not confined to a business or transaction which affects federal funds."); *United States v. Spano*, 401 F.3d 837, 839 (7th Cir. 2005) (explaining that "a plain reading of the statute requires no nexus between the bribe and the federal funds received"). It is easy to see why: money is fungible and "money can be drained off here because a federal grant is pouring in there." *Sabri*, 541 U.S. at 606. Thus, the federal-funds element was met when the parties stipulated that the

City of Gary as a whole received more than $10,000 in federal benefits in a one-year period.

**B**

Next, Bowling challenges the district court's decision to admit part of Ms. Krug's testimony. When the city's account with CDW went into recovery, Ms. Krug explicitly stated that she would deal only with Ms. Green, the city's controller. Shortly thereafter, however, Ms. Krug received an email purportedly from Ms. Green's email account, copying Bowling, essentially assuring Ms. Krug that everything was fine with the account and that Bowling would be processing payments. At trial, the government asked Ms. Krug a series of questions regarding what she thought when she "received this e-mail that indicated it came from Celita Green." Ms. Krug first explained that "[w]hen I read the e-mail, I felt there was something wrong. I don't believe it came from Celita Green." The government followed up to draw out why Ms. Krug thought that. Ms. Krug testified that she made it clear to both Ms. Green and Bowling "that the only person [she] wanted to deal with was" Ms. Green and, in turn, Ms. Green also made it "very clear" to her that she "would be dealing solely with Ms. Green." After laying that foundation, the government then asked the question, "So when you received this e-mail, what did you think?" Ms. Krug responded, "I thought there was some kind of fraud going on."

Bowling objects to the use of the word "fraud" on two evidentiary grounds: first, that it was improper lay opinion testimony under Federal Rule of Evidence 701; and second, that it also constituted improper propensity evidence under Federal Rule of Evidence 404(b). At trial, however, Bowling objected to the testimony only on relevance grounds and then

argued at a sidebar that it was also improper lay testimony. A party must state the specific ground for an objection to preserve the evidentiary error for appellate review. Fed. R. Evid. 103(a)(1)(B). A general objection to "relevance" at trial will not preserve an objection under Rule 404(b) for review. *United States v. Mejia*, 909 F.2d 242, 246 (7th Cir. 1990). Thus, only Bowling's Rule 701 objection is properly preserved on appeal.

We review a preserved challenge to the district court's evidentiary ruling for abuse of discretion. *United States v. Saunders*, 826 F.3d 363, 370 (7th Cir. 2016). A trial court abuses its discretion only if no reasonable person could take that view. *United States v. Rainone*, 816 F.3d 490, 497 (7th Cir. 2016). Even if we find an abuse of discretion, we will reverse only if "admission of the evidence affected the defendant's 'substantial rights.'" *United States v. Richards*, 719 F.3d 746, 758 (7th Cir. 2013) (quoting Fed. R. Crim. P. 52(a)).

Lay testimony that is in the form of an opinion is permissible if it is rationally based on the witness's perception, helpful to understanding the witness's testimony, and not based on specialized knowledge. Fed. R. Evid. 701; *see also United States v. Hilliard*, 851 F.3d 768, 779–80 (7th Cir. 2017). "The rule is a sensible elaboration of Rule 602, which requires that a lay witness's testimony be based on personal knowledge." *United States v. Giovannetti*, 919 F.2d 1223, 1226 (7th Cir. 1990). Certainly, a witness has personal knowledge of her own mental processes and is competent to testify regarding them. A district court's decision to admit "such testimony is not problematic." *Giovannetti*, 919 F.2d at 1226.

The question posed to Ms. Krug was carefully worded to elicit Ms. Krug's personal thoughts at the time she received the subject email, and the responsive "fraud" testimony

concerned only her own thoughts upon receipt of that email. She was not drawing an inference from the evidence or offering a legal opinion or conclusion that Bowling had in fact committed fraud regarding the computer orders. Instead, Ms. Krug testified as to her reaction at the time based on her own perception. Although Ms. Krug used the word "fraud," a legal term in certain circumstances, the clear import of the testimony was that Ms. Krug used the term in the colloquial sense. *See United States v. Locke*, 643 F.3d 235, 242 (7th Cir. 2011) (holding witnesses' use of the word "fraud" in the colloquial sense, "employing the vernacular of their financial professions," was not improper lay testimony). A witness's informal use of a term that may also be legal in character does not inexorably turn that testimony into improper lay testimony.

The nature of Ms. Krug's testimony is even more transparent given the clarification on the followup question. After Bowling's objection and a short sidebar, the government reasked, "what was your impression when you received this e-mail?" and Ms. Krug answered that her "impression was that there was something wrong, that I did not believe it came from Celita Green." Ms. Krug testified based on her personal perception of the email at the time she received it and that testimony was appropriate under Rule 701.

On appeal Bowling further contends that the "fraud" testimony was improper propensity evidence. Because she did not object on this specific ground at the trial court, she forfeited the objection and the claimed evidentiary error is reviewed for plain error only. *United States v. Price*, 418 F.3d 771, 779 (7th Cir. 2005). Rule 404(b) bars evidence of a crime, wrong, or other act if the purpose is to "show that on a

particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But the law is clear that "Rule 404(b) does not apply to direct evidence of the crime charged." *United States v. Ferrell*, 816 F.3d 433, 443 (7th Cir. 2015). Ms. Krug's testimony about the email "fraud"—used colloquially—was not other-act evidence to show that Bowling had a propensity to steal; it was direct evidence of her theft from the city. She was charged with obtaining the property by fraud. Moreover, conduct taken for the purpose of thwarting discovery of the crime or postponing the investigation of the crime *is* part of the charged crime. *See United States v. O'Connor*, 874 F.2d 483, 486 (7th Cir. 1989). Bowling sent the email, purportedly from the city's controller, to CDW to "preserve[] the appearance of propriety" and keep "everything copacetic" so that CDW would hold off from further escalating its complaint with the city. *United States v. Mankarious*, 151 F.3d 694, 705 (7th Cir. 1998). As such, Ms. Krug's testimony about the email was direct evidence of Bowling's attempt to stall the city's ultimate discovery of her theft by fraud. There was no error, plain or otherwise, admitting the testimony under Rule 404(b).

## C

Bowling received a two-level sentencing enhancement for obstruction of justice because the district court found that she faked mutism and caused a one-year delay in the proceedings. The application of the Sentencing Guidelines is a mixed question of law and fact. We review the district court's factual findings supporting the obstruction of justice enhancement for clear error. *United States v. DeLeon*, 603 F.3d 397, 402 (7th Cir. 2010). We will not disturb the district court's factual findings as long as they are "plausible in light of the record in its

entirety." *Id*. (quoting *United States v. Powell*, 576 F.3d 482, 498 (7th Cir. 2009)). We review de novo whether those factual findings adequately support the application of the sentencing enhancement. *Id*.

The obstruction of justice sentencing enhancement provides that a defendant's offense level shall be increased by two levels if:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense … .

U.S.S.G. § 3C1.1. The application notes provide a nonexhaustive list of examples of obstructive conduct, which includes the commonly thought of obstructive behaviors such as witness intimidation, perjury, destroying evidence, escaping custody, and so on. *Id*. cmt. n.4. Certainly, obstructive conduct can "vary widely in nature," *id*. cmt. n.3, and the enhancement envisions circumstances beyond conduct directly connected to the commission of the crime that would no less be obstructive and impede the administration of justice.

There is no question that malingering or feigning incompetence may constitute an obstruction of justice for purposes of a sentencing enhancement. We have held that it does, and so has every other circuit to address the issue. *United States v. Wilbourn*, 778 F.3d 682, 684 (7th Cir. 2015); *see also, e.g., United States v. Nygren*, 933 F.3d 76, 86 (1st Cir. 2019) (collecting cases). Bowling does not ask us to overrule our precedent, but

nonetheless asks us to depart from *Wilbourn*'s holding based on perceived factual distinctions. Whatever factual differences may exist, they are irrelevant here.

The district court's factual finding that Bowling was malingering was not clearly erroneous and is more than a plausible finding in light of the record. The court found Dr. Correa's forensic psychology report and opinion that Bowling was malingering "very, very persuasive." Bowling was evaluated over the course of a two-month period at FMC Carswell and Dr. Correa and her staff administered several psychological tests. One such test in particular was the Test of Memory Malingering, which Bowling scored well-below "scores typically obtained even by patients with cognitive impairment, traumatic brain injury, or dementia," and "below-chance on all three trials." Further, Dr. Correa's report contained well-documented evidence of Bowling's linear thinking and high cognitive ability, including Bowling's extensive email communications with her family regarding her legal proceedings and family matters while housed at FMC Carswell. It also particularly struck the court that Bowling was able to communicate verbally both before and immediately after the trial, and it was only the period in which the trial loomed that Bowling remained mute. In arriving at its finding, the district court placed much more weight on Dr. Correa's forensic psychology report and testimony than that of Dr. Coyle, Bowling's expert, because Dr. Coyle evaluated Bowling a year later and during a more narrow timeframe. Based on all of the evidence, the district court found that Bowling deliberately exaggerated her symptoms and remained mute to unnecessarily delay the proceedings. We see no reason in the record to upset the district court's well-supported finding.

Finally, as a policy matter, Bowling suggests that if we hold that feigning incompetence is an obstruction of justice, we will discourage lawyers from seeking competency examinations for their clients. The concern is overstated. First, *Wilbourn* has been the law of this circuit for several years now and there is no evidence that defense attorneys have been deterred from requesting competency examinations in its wake. Second, and more fundamentally, the Guidelines state that the enhancement should not punish a defendant for the exercise of a constitutional right, U.S.S.G. § 3C1.1 cmt. n.2, and a defendant has the right to be deemed competent to stand trial. It is not an obstruction of justice to merely request a competency examination, even if the defendant is ultimately deemed competent. It is only an obstruction of justice to intentionally feign incompetence for the purpose of delaying or attempting to avoid the criminal proceedings. That is a distinction with an important difference. We are confident that counsel will continue to request competency examinations whenever they reasonably believe that their client may not be mentally competent to stand trial. Defendants who deliberately exaggerate their symptoms do so at their own peril and risk receiving an enhanced sentence.

## III

For the foregoing reasons, we affirm the district court's judgment.