# United States Assistance to Countries that Shoot Down Civil Aircraft Involved in Drug Trafficking

The Aircraft Sabotage Act of 1984 applies to the police and military personnel of foreign governments. In particular, the Act applies to the use of deadly force by such foreign governmental actors against civil aircraft in flight that are suspected of transporting illegal drugs  There is accordingly a substantial risk that United States Government officers and employees who provide flight tracking information or certain other forms of assistance to the aerial interdiction programs of foreign governments that have destroyed such aircraft, or that have announced an intent to do so, would be aiding and abetting conduct that violated the Act.

July 14, 1994

MEMORANDUM OPINION FOR THE DEPUTY ATTORNEY GENERAL[*]

This memorandum summarizes our earlier advice concerning whether and in what circumstances United States Government ("USG") officers and employees may lawfully provide flight tracking information and other forms of technical assistance to the Republics of Colombia and Peru. The information and other assistance at issue have been provided to the aerial interdiction programs of those two countries for the purpose of enabling them to locate and intercept aircraft suspected of engaging in illegal drug trafficking.

Concern over the in-flight destruction of civil aircraft as a component of the counternarcotics programs of foreign governments is not novel. In 1990, soon after the inception of the USG assistance program, the United States made an oral démarche to the Colombian government informing that government that Colombian use of USG intelligence information to effect shootdowns could result in the suspension of that assistance.

More recently, we understand that the government of Peru has used weapons against aircraft suspected of transporting drugs and that the government of Colombia has announced its intention to destroy in-flight civil aircraft suspected of involvement in drug trafficking. The possibility that these governments might use the information or other assistance furnished by the United States to shoot down civil aircraft raises the question of the extent to which the United States and its governmental personnel may lawfully continue to provide assistance to such programs.

On May 1, 1994, in light of these concerns, the Department of Defense suspended a variety of assistance programs. Thereafter, in a draft opinion, an interagency working group concluded that the United States aid was probably unlawful.

---

[*] Editors Note: In response to this opinion, Congress enacted Pub. L. No 103-337, § 1012, 108 Stat 2663, 2837 (1994) (codified at 22 U S C  § 2291-4 (1994)).

The group included lawyers from the Criminal Division, the Departments of State, Defense (including the Joint Chiefs of Staff), the Treasury, and Transportation (including the Coast Guard), and the Federal Aviation Administration. On May 26, 1994, this Department advised all relevant agencies that assistance programs directly and materially supportive of shootdowns should be suspended pending the completion of a thorough review of the legal questions.

After careful consideration of the text, structure and history of the Aircraft Sabotage Act of 1984, the most relevant part of which is codified at 18 U.S.C. § 32(b)(2), we have concluded that this statute applies to governmental actors, including the police and military personnel of foreign countries such as Colombia and Peru. Accordingly, there is a substantial risk that USG personnel who furnish assistance to the aerial interdiction programs of those countries could be aiding and abetting criminal violations of the Aircraft Sabotage Act. *See* 18 U.S.C. § 2(a) (aiding and abetting statute). We caution, however, that these conclusions are premised on our close analysis of § 32(b)(2) and should not be taken to mean that other domestic criminal statutes will necessarily apply to USG personnel acting officially.

## I.

International law forms an indispensable backdrop for understanding § 32(b)(2). A primary source of international law regarding international civil aviation is the Convention on International Civil Aviation, Dec. 7, 1944, 61 Stat. 1180, T.I.A.S. No. 1591, 15 U.N.T.S. 295 ("the Chicago Convention"). The Chicago Convention is administered by the International Civil Aviation Organization ("ICAO").

Article 3(d) of the Chicago Convention declares that "[t]he contracting States undertake, when issuing regulations for their state aircraft, that they will have due regard for the safety of navigation of civil aircraft." Parties have interpreted the due regard standard quite strictly, and have argued that this provision proscribes the use of weapons by states against civil aircraft in flight.[1] For example, the United States invoked this provision during the international controversy over the Korean Air Lines Flight 007 ("KAL 007") incident.[2] While acknowledging that Article 1 of the Chicago Convention recognized the customary rule that "every State has complete and exclusive sovereignty over the airspace above its territory," the United States argued that the Soviet Union had violated both Article 3(d) and customary international legal norms in shooting down KAL

---

[1] Article 89 of the Chicago Convention relieves a state party from its obligations under the Convention if it declares a national emergency and certifies that declaration to ICAO. To date, neither Colombia nor Peru has made such a certification. The Chicago Convention contains no explicit exemption permitting the in-flight destruction of aircraft suspected of carrying contraband or of otherwise being involved in the drug trade

[2] On September 1, 1983, a Soviet military aircraft shot down a civil aircraft, KAL 007, that had overflown Soviet territory while on a scheduled international flight to Seoul

007. The Administrator of the Federal Aviation Authority stated to the ICAO Council that:

> The ICAO countries have agreed that they will "have due regard for the safety of navigation of civil aircraft" when issuing regulations for their military aircraft. It is self-evident that intercepts of civil aircraft by military aircraft must be governed by this paramount concern.
>
> The international community has rejected deadly assault on a civil airliner by a military aircraft in time of peace as totally unacceptable. It violates not only the basic principles set forth in the [Chicago] convention but also the fundamental norms of international law . . . .[3]

In the wake of KAL 007, the ICAO Assembly unanimously adopted an amendment to the Chicago Convention to make more explicit the prohibitions of Article 3(d).[4] This amendment, Article 3 *bis*, reads in part as follows:

> (a) The contracting States recognize that every State must refrain from resorting to the use of weapons against civil aircraft in flight and that, in case of interception, the lives of persons on board and the safety of aircraft must not be endangered. This provision shall not be interpreted as modifying in any way the rights and obligations of States set forth in the Charter of the United Nations.[5]

Article 3 *bis* should be understood to preclude states from shooting down civil aircraft suspected of drug trafficking, and the only recognized exception to this rule is self-defense from attack.[6] We understand that the United States has not yet ratified Article 3 *bis*. There is, however, support for the view that the principle it announced is declaratory of customary international law.[7]

---

[3] *FAA Administrator Helms' Statement, ICAO Council, Sept 15, 1983 Montreal,* Dep't St Bull, Oct. 1983, at 17, 18 We further note that the ICAO Council Resolution of September 16, 1983, condemned the shootdown of KAL 007 and "[r]eaffirm[ed] the principle that States, when intercepting civil aircraft, should not use weapons against them " *Id.* at 20.

[4] *See* Jeffrey D. Laveson, *Korean Airline Flight 007. Stalemate in International Aviation Law — A Proposal for Enforcement,* 22 San Diego L Rev. 859, 882-84 (1985)

[5] USG representatives proposed a reference to the United Nations Charter ("Charter") to reflect the view that an international law prohibition on the use of weapons against civil aircraft in flight would not restrict a state's right of self-defense as provided for in Article 51 of the Charter.

[6] *See* Steven B. Stokdyk, Comment, *Airborne Drug Trafficking Deterrence Can A Shootdown Policy Fly?,* 38 UCLA L. Rev. 1287, 1306 (1991)

[7] *See, e.g.,* Andreas F. Lowenfeld, *Looking Back and Looking Ahead,* 83 Am J Int'l L. 336, 341 & n 17 (1989); Sompong Sucharitkul, *Procedure for the Protection of Civil Aircraft in Flight,* 16 Loy L A Int'l &

In addition to the Chicago Convention, the United States has ratified the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation (Sabotage), *done* Sept. 23, 1971, 24 U.S.T. 567, 10 I.L.M. 1151 (1971) ("the Montréal Convention"). Article 1 of the latter Convention specifies certain substantive offenses against civil aircraft: in particular, Article 1,1(b) states that "[a]ny person commits an offence if he unlawfully and intentionally . . . destroys an aircraft in service or causes damage to such an aircraft which renders it incapable of flight or which is likely to endanger its safety in flight." Article 1,2 makes it an offense to attempt to commit a previously enumerated offense, or to be an accomplice of an offender.[8] Further, Article 10 requires states "in accordance with international and national law," to "endeavour to take all practicable measures for the purpose of preventing" substantive offenses.

The Montréal Convention imposes on states certain duties with respect to offenders or alleged offenders. Article 3 declares that the contracting states "undertake[] to make the offences mentioned in Article 1 punishable by severe penalties." This obligation is specified by requiring states to take measures to establish jurisdiction over certain offenses (Article 5), to take custody of alleged offenders within their territory (Article 6), and either to extradite the alleged offender or to submit the case to their competent authorities for prosecution (Article 7). Further, states have the obligation to report the circumstances of an offense, and the results of their extradition or prosecution proceedings, to the ICAO (Article 13).

Nearly all nations with a significant involvement in air traffic are parties to the Montréal Convention, and have thus incurred the responsibility to execute it. The United States implemented the Convention in 1984 by enacting the Aircraft Sabotage Act, Pub. L. No. 98-473, §§ 2011-2015, 98 Stat. 1837, 2187-90 (1984). Congress specifically stated that legislation's purpose was "to implement fully the [Montréal] Convention . . . and to expand the protection accorded to aircraft and related facilities." *Id.* § 2012(3); *see also* S. Rep. No. 98-619 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3682.[9] The criminal prohibition now codified at 18 U.S.C. § 32(b)(2) was enacted as part of that legislation.

---

Comp. L J 513, 519-20 (1994) *But see* D J Harris, *Cases and Materials on International Law* 221 (4th ed 1991)

[8] In general, the furnishing of information or assistance to another nation in circumstances that clearly indicate a serious risk that the information or assistance will be used by that nation to commit a wrongful act may itself be a wrongful act under international law. *Cf* Article 27 of the International Law Commission's Draft Convention on State Responsibility, which provides that "[a]id or assistance by a State to another State, if it is established that it is rendered for the commission of an internationally wrongful act carried out by the latter, itself constitutes an internationally wrongful act, even if, taken alone, such aid or assistance would not constitute the breach of an international obligation " *Report of the International Law Commission on the Work of its Thirty-Second Session*, [1980] 2 Y B Int'l L Comm'n 33, U.N. Doc. A/35/10.

[9] It is undoubtedly within Congress's power to provide that attacks on civil aircraft should be criminal acts under domestic law, even if they were committed extraterritorially and even absent any special connection between this country and the offense An attack on civil aircraft can be considered a crime of "universal concern" to the community of nations *See United States v Yunis*, 924 F 2d 1086, 1091 (D.C. Cir. 1991),

## II.

We turn to the question of criminal liability under domestic law. At least two criminal statutes are relevant to this inquiry. The first is 18 U.S.C. § 32(b)(2), which implements Article 1,1(b) of the Montréal Convention, and prohibits the destruction of civil aircraft. The second is 18 U.S.C. § 2(a), which codifies the principle of aiding and abetting liability.[10]

### A.

18 U.S.C. § 32(b)(2) was enacted in 1984, one year after the destruction of KAL 007. The statute makes it a crime "willfully" to "destroy[] a civil aircraft registered in a country other than the United States while such aircraft is in service or cause[] damage to such an aircraft which renders that aircraft incapable of flight or which is likely to endanger that aircraft's safety in flight."[11] The text, structure and legislative history of the statute establish that it applies to the actions of the Peruvian and Columbian officials at issue here.

The term "civil aircraft," as used in § 32(b)(2), is defined broadly to include "any aircraft other than . . . an aircraft which is owned and operated by a governmental entity for other than commercial purposes or which is exclusively leased by such governmental entity for not less than 90 continuous days." 49 U.S.C. app. § 1301(17), (36) (definitions section of Federal Aviation Act of 1958). *See* 18 U.S.C. § 31 (in chapter including § 32(b)(2), "civil aircraft" has meaning ascribed to term in Federal Aviation Act). The qualifying language providing that the section applies to "civil aircraft *registered in a country other than the United States,*" 18 U.S.C. § 32(b)(2) (emphasis added), has an expansive rather than restrictive purpose — to extend United States criminal jurisdiction over persons destroying

---

*see generally* Kenneth C. Randall, *Universal Jurisdiction Under International Law,* 66 Tex. L. Rev 785 (1988)

[10] Other criminal statutes may also be relevant For example, 49 U.S.C app § 1472(i)(1) makes it a crime to commit, or to attempt to commit, aircraft piracy "Aircraft piracy" is defined to "mean[] any seizure or exercise of control, by force or violence or threat of force or violence, or by any other form of intimidation, and with wrongful intent, of an aircraft within the special aircraft jurisdiction of the United States." *Id.* § 1472(i)(2). The "special aircraft jurisdiction of the United States" includes "civil aircraft of the United States" while such aircraft is in flight *Id.* § 1301(38)(a) We do not consider in this memorandum whether the prohibition on aircraft piracy, or any criminal statutes other than § 32(b) and the aiding and abetting and conspiracy statutes, would be applicable to the USG activities in question here

[11] Section 32(b) is a felony statute, and pursuant to 18 U S C § 34, persons who violate § 32 are subject to "the death penalty or to imprisonment for life" if the crime "resulted in the death of any person." However, § 34 predates the Supreme Court decision in *Furman v Georgia,* 408 U S 238 (1972), and may not be applicable consistent with that decision In a pending case, *United States v Cheely,* 21 F.3d 914 (9th Cir. 1994), a divided panel of the Ninth Circuit issued an opinion on April 11, 1994, concluding that the death penalty provided for by 18 U S C. § 844(d) (which incorporates § 34 by reference) is unconstitutional. However, the court has, *sua sponte,* requested the parties to address the issue whether the case should be reheard en banc, and it remains uncertain whether § 34 can be applied constitutionally Pending crime legislation would resolve this issue for future violations by providing a constitutional death penalty provision.

civil aircraft "'even if a U.S. aircraft was not involved and the act was not within this country.'" *United States v. Yunis,* 681 F. Supp. 896, 906 (D.D.C. 1988) (citation omitted).[12]

Section 32(b)(2) was intended to apply to governmental actors (here, the military and police forces of Colombia and Peru) as well as to private persons and groups. When Congress adopted § 32(b)(2) in 1984, it had been a crime for nearly thirty years under § 32(a)(1) for anyone willfully to "set[] fire to, damage[], destroy[], disable[], or wreck[] any aircraft in the special aircraft jurisdiction of the United States or any civil aircraft used, operated, or employed in interstate, overseas, or foreign air commerce." 18 U.S.C. § 32(a)(1).[13] This Department has sought, under § 32(a), to prosecute state actors whom it believes to have sponsored terrorist acts (specifically, the bombing of Pan American Flight 103 at the behest of Libya). Because of the obvious linguistic and structural similarities between §§ 32(a)(1) and 32(b)(2), we read those sections to have the same coverage in this regard, i.e., to apply to governmental and non-governmental actors alike.[14]

---

[12] It might be argued that § 32(b)(2)'s reference to aircraft "registered in a country other than the United States" is restrictive in meaning, i e , that the section does not protect *unregistered* aircraft Moreover, we are informed that the registration numbers of aircraft engaged in drug trafficking over Colombia and Peru have in some cases been painted over or otherwise obscured It is suggested that unregistered aircraft, or aircraft whose registration is concealed, may be made targets under a shootdown policy without violating the statute There are several flaws in this suggestion. (1) Congress stated that its purpose in enacting the Aircraft Sabotage Act was "to implement fully" the Montréal Convention *See* 18 U.S.C § 31 note. Article 1,1(b) of the Convention (from which 18 U.S.C § 32(b)(2) is derived) prohibits the destruction of civil aircraft *as such*, without regard to registration Because § 32(a)(1) had already forbidden the willful destruction of "any aircraft in the special aircraft jurisdiction of the United States or any civil aircraft used, operated, or employed in interstate, overseas, or foreign air commerce," Congress evidently sought to discharge this country's remaining obligations under the Montréal Convention by affording the same protection to all other civil aircraft Accordingly, the protections provided by § 32(b)(2) should not be deemed to hinge on whether a foreign civil aircraft is in fact registered, had Congress done no more than that, the United States would have fallen short of fulfilling its treaty obligations, although Congress intended that it should fulfill them. Section 32(b)(2)'s reference to "civil aircraft registered in a country other than the United States" "must be taken to refer to the class with which the statute undertakes to deal " *United States v Jin Fuey Moy,* 241 U S 394, 402 (1916) (Holmes, J.) (construing scope of registration requirement in criminal statute) *See also United States v. Rodgers,* 466 U S. 475, 478-82 (1984), *Continental Training Services Inc. v Cavazos,* 893 F 2d 877, 883 (7th Cir 1990) (2) We are advised by the Federal Aviation Authority that the concealment or obscuring of a registration number does not legally "deregister" an airplane, and that only an official act by the registering government can achieve that effect Accordingly, suspected drug traffickers whose registration is concealed cannot be deemed to be unregistered (3) There is no logical connection between the class of aircraft engaged in drug smuggling and the class of unregistered aircraft Nor do we know of any empirical evidence that the two classes significantly overlap Further, drug traffickers may own, lease or steal planes; and even if it were their practice not to register the planes they own, the owners of the planes they have leased or stolen might normally do so. (4) We are also unaware of any reliable means by which foreign law enforcers who have intercepted a plane could determine while it was in flight whether it was registered or not Indeed, the very act of destroying a plane might prevent investigators from determining its registration (if any) Thus, it would be difficult, if not impossible, to monitor a "shoot down" policy so as to ensure that the participants in it avoided criminal liability by targeting only unregistered planes

[13] Section 32(a) was adopted in 1956, *see* Pub. L No. 84-709, 70 Stat 538, 539 (1956)

[14] While § 32(a) does not have the broad extraterritorial scope of § 32(b)(2), it does apply to acts against United States-registered aircraft abroad, and thus would apply with respect to any such aircraft shot down by Colombian or Peruvian authorities.

The legislative history of the Aircraft Sabotage Act confirms that Congress intended § 32(b)(2) to reach governmental actions. The original bill was introduced as part of a package of four related measures proposed by the Administration and designed to enable the United States to combat international terrorism, including state-sponsored actions, more effectively. In submitting this legislative package to Congress, the President explained that it was largely concerned with

> a very worrisome and alarming new kind of terrorism . . .: the direct use of instruments of terror *by foreign states*. This "state terrorism" . . . accounts for the great majority of terrorist murders and assassinations. Also disturbing is state-provided training, financing, and logistical support to terrorists and terrorist groups.

Message to the Congress Transmitting Proposed Legislation To Combat International Terrorism, *Pub. Papers of Ronald Reagan* 575 (1984) (emphasis added).

Further, in testimony given at a Senate Judiciary Committee hearing on these bills on June 5, 1984, Wayne R. Gilbert, Deputy Assistant Director of the Criminal Investigative Division of the Federal Bureau of Investigation, underscored that:

> Recent years reflect increasing concern both in the United States and in foreign nations over the use of terrorism *by foreign governments* or groups. We have seen an increased propensity on the part of terrorist entities to plan and carry out terrorist acts worldwide.

*Legislative Initiatives to Curb Domestic and International Terrorism: Hearings Before the Subcomm. on Security and Terrorism of the Senate Comm. on the Judiciary*, 98th Cong. 44 (1984) ("Hearings") (statement of Wayne R. Gilbert) (emphasis added). In written testimony, the Department of Justice also explained that "[t]hese four bills address some of the risks caused by the growing worldwide terrorism problem, *especially state-supported terrorism*." *Id.* at 46-47 (prepared statement of Victoria Toensing, Deputy Assistant Attorney General, Criminal Division) (emphasis added).[15] The legislative history of § 32(b)(2) thus shows that the statute was intended to reach shootdowns by officials or agents of governments as well as by private individuals and organizations.

Because § 32(b)(2) applies generally to foreign governments, it must apply to shootdowns of foreign-registered civil aircraft by law enforcement officers or military personnel of the governments of Colombia and Peru. The statute contains no exemption for shootdowns in pursuance of foreign law enforcement activity; nor

---

[15] In a colloquy between Senator Denton and Mr Gilbert on the bill addressed to aircraft sabotage, Senator Denton commented that "we should not ignore the fact that in Libya a General Wolf, whose full name is Marcus Wolf, set up and acts as the chief of Libyan Intelligence." *Id.* at 81 In context, Senator Denton's comment seems to reflect his understanding that the legislation would reach state-sponsored attacks on civil aircraft or air passengers and the officials responsible for such attacks

does it exempt shootdowns of aircraft suspected of carrying contraband.[16] USG personnel who aid and abet violations of § 32(b)(2) by the Colombian or Peruvian governments are thus themselves exposed to criminal liability by virtue of 18 U.S.C. § 2(a), *see* Part II B below.[17]

Our conclusion that § 32(b)(2) applies to governmental action should not be understood to mean that other domestic criminal statutes apply to USG personnel acting officially. Our Office's precedents establish the need for careful examination of each individual statute. For example, we have opined that USG officials acting within the course and scope of their duties were not subject to section 5 of the Neutrality Act, 18 U.S.C. § 960. *See Application of Neutrality Act to Official Government Activities*, 8 Op. O.L.C. 58 (1984) ("Neutrality Act Opinion"). In general terms, that statute forbids the planning of, provision for, or participation in "any military or naval expedition or enterprise to be carried on from [the United States] against the territory or dominion of any foreign prince or state . . . with whom the United States is at peace," 18 U.S.C. § 960; it does not explicitly exempt USG-sponsored activity. Our conclusion with respect to the Neutrality Act was based upon an examination of the legislative history of the Act, its practical construction over two centuries by Presidents and Congresses, and the judicial decisions interpreting it.[18]

## B.

The question we have been asked presupposes that USG personnel would not themselves directly carry out shootdowns of civil aircraft or encourage others to do

---

[16] Although the legislative history emphasizes the dangers of state-sponsored "terrorism," we do not understand the statute to exempt state activity that could arguably be characterized as "law enforcement." An action such as the Soviet Union's shooting down of KAL 007 could have been viewed as the enforcement of national security laws regulating overflights in militarily sensitive airspace, and thus distinguished from acts of terrorist violence. Nevertheless, we think that § 32(b)(2) would apply to such attacks on civil aviation.

[17] Section 32(b)(2) would also apply directly to USG personnel who themselves shot down foreign-registered civil aircraft, although on the facts as we understand them such conduct — as distinct from aiding and abetting foreign governmental violations — is not at issue here. (For further discussion, *see* Part V below.) Nothing in the legislative history of § 32(b)(2) suggests that that statute would not apply to USG personnel in proper cases as much as it does to foreign governmental personnel.

[18] We noted in the Neutrality Act Opinion that "the Act's purpose was to enhance the President's ability to implement the foreign policy goals that have been developed by him, with appropriate participation by Congress." *Id.* at 72. Accordingly, we found that "it would indeed be anomalous" to construe that Act to limit what USG officials acting under Presidential foreign policy directives could lawfully do. *Id.* By contrast, interpreting the Aircraft Sabotage Act to reach such actors would not obstruct the statute's purpose, which in any case was not to ensure the President's ability to conduct a unified and consistent foreign policy unimpeded by private citizens' interferences. If anything, it would be contrary to the Aircraft Sabotage Act's policy of protecting international civil aviation from armed attacks to allow USG officials, but not those of any other country, to carry out such attacks. Furthermore, although it is often true that "'statutes which in general terms divest pre-existing rights or privileges will not be applied to the sovereign without express words to that effect, " *id.* (quoting *United States v United Mine Workers*, 330 U S 258, 272 (1947)), that maxim is "'no hard and fast rule of exclusion,' and much depends on the context, the subject matter, legislative history, and executive interpretation " *Wilson v Omaha Indian Tribe*, 442 U.S. 653, 667 (1979) (quoting *United States v Cooper Corp*, 312 U.S 600, 604-05 (1941))

so. Thus, the lawfulness of USG activities and the potential liability of USG personnel, under the circumstances outlined to us, depend on the proper application of the federal aider and abettor statute, 18 U.S.C. § 2(a).

Section 2(a) does not itself define any criminal offense, but rather provides that a person who is sufficiently associated with the criminal act of another is liable as a principal for that act.

> Under the "classic interpretation" of this offense, "[i]n order to aid and abet another to commit a crime it is necessary that a defendant in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed."

*United States v. Monroe*, 990 F.2d 1370, 1373 (D.C. Cir. 1993) (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)) (internal quotation marks and citations omitted).

Aiding and abetting liability for a crime can be usefully analyzed as consisting of three elements: "[1] *knowledge* of the illegal activity that is being aided and abetted, [2] a *desire* to help the activity succeed, and [3] some *act* of helping." *United States v. Zafiro*, 945 F.2d 881, 887 (7th Cir. 1991) (enumeration added), *aff'd*, 506 U.S. 534 (1993). All three elements must be present for aiding and abetting liability to attach. *Id.*

**1. Knowledge of unlawful activity.** A person must know about unlawful activity in order to be guilty of aiding and abetting it: "a person cannot very well aid a venture he does not know about." *United States v. Allen*, 10 F.3d 405, 415 (7th Cir. 1993). With respect to most or perhaps all countries to which the United States provides information or other assistance (other than Colombia and Peru), the absence of this first element of aiding and abetting eliminates entirely any possibility that the USG activities implicate 18 U.S.C. § 32(b). In the absence of some serious reason to think otherwise, the United States is entitled to assume that the governments of other nations will abide by their international commitments (such as the Chicago Convention) and customary international law. The fact that another government theoretically could act otherwise cannot render USG aid activities legally problematic. Furthermore, the United States is under no general obligation to attempt to determine whether another government has an as-yet unrevealed intention to misuse USG assistance in a violation of § 32(b). *See United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir. 1990) ("Aider and abettor liability is not negligence liability."). Therefore, if a foreign nation with no announced policy or known practice of unlawful shootdowns did in fact use USG aid in carrying out a shootdown, that event would create no liability for the prior acts of USG personnel,

although it probably would require a reevaluation of USG assistance to that country and, depending on the circumstances, might require changes in that assistance.

The same analysis, however, does not apply where the foreign state does have an announced policy or known practice of carrying out shootdowns that violate § 32(b)(2) — precisely the situation with respect to Colombia and Peru. It is obvious that the United States has knowledge of Colombia's publicly avowed policy. We believe that the United States is equally on notice about Peru's *de facto* shootdown policy on the basis of the incidents that have occurred.[19] It appears to be settled law that the knowledge element of aiding and abetting is satisfied where the alleged aider and abettor attempted to escape responsibility through a "deliberate effort to avoid guilty knowledge" of the primary actor's intentions. *Giovannetti*, 919 F.2d at 1229. Someone who suspected the existence of illegal activity that his or her actions were furthering and who took steps to ensure that the suspicion was never confirmed, "far from showing that he was not an aider and abettor . . . would show that he was." *Id.* On the facts as presented to us, we think that the knowledge element is met with respect to Colombia and Peru unless there is a change in the policies of those countries.

**2. Desire to facilitate the unlawful activity.** "[T]he aider and abettor must share the principal's purpose" in order to be liable under 18 U.S.C. § 2. *United States v. Fountain*, 768 F.2d 790, 798 (7th Cir. 1985), *cert. denied*, 475 U.S. 1124 (1986). The contours of this element in the definition of aiding and abetting are not without ambiguity, *see Zafiro*, 945 F.2d at 887, although as a general matter mere knowledge of the criminal activity (the existence of the first, knowledge element) does not in itself satisfy this second, purpose element. Many courts state the purpose element in terms of a "specific intent that [the aider and abettor's] act or omission bring about the underlying crime," *United States v. Zambrano*, 776 F.2d 1091, 1097 (2d Cir. 1985), and the Supreme Court's most recent restatement of the aiding and abetting statute's reach suggests — if it does not quite endorse — this view. *See Central Bank of Denver v. First Interstate Bank*, 511 U.S. 164, 181 (1994) (section 2(a) "decrees that those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime") (citing *Nye & Nissen*, 336 U.S. at 619).

At first glance it might appear that the United States could negate this element of aiding and abetting — and thus render USG assistance to Colombia and Peru lawful and USG personnel free of potential liability under 18 U.S.C. § 32(b)(2) — simply by announcing this Government's opposition to any violations of § 32(b) by anyone. It might seem that after such an announcement it would not be possible to say that USG personnel acted with a desire to help unlawful shootdowns succeed.

---

[19] For the purposes of the aiding and abetting statute, it is immaterial whether an aider and abettor knew of the unlawful activity because the primary actor told him or her, or simply took actions that made obvious what was happening *See generally Giovannetti*, 919 F 2d at 1226-29.

However, "there is support for relaxing this requirement [of specific intent to bring about the criminal act] when the crime is particularly grave: . . . 'the seller of gasoline who knew the buyer was using his product to make Molotov cocktails for terroristic use'" would be guilty of aiding and abetting the buyer's subsequent use of the "cocktails" in an act of terrorism. *Fountain*, 768 F.2d at 798 (quoting with approval *People v. Lauria*, 251 Cal. App. 2d 471, 481 (1967) *(dictum)*). Where a person provides assistance that he or she knows will contribute directly and in an essential manner to a serious criminal act, a court readily may infer a desire to facilitate that act. *See Zafiro*, 945 F.2d at 887 (if someone "knowingly provides essential assistance, we can infer that [that person] does want [the primary actor] to succeed, for that is the natural consequence of his deliberate act").[20]

Were this a case in which a foreign government provided direct and material assistance to an attack upon United States civil aircraft, both our Government and, we believe, the courts of this country would view the offense against § 32(b)(2) to be of a very serious nature, and would adopt an expansive view of the "desire to help the [unlawful] activity succeed" that constitutes this element of aiding and abetting. *United States v. Carson*, 9 F.3d 576, 586 (7th Cir. 1993), *cert. denied*, 513 U.S. 844 (1994). As we understand the facts, USG assistance is critical to the ability of Colombia and Peru to effect shootdowns. USG personnel have been fully engaged in the air interdiction operations of each country, providing substantial assistance that has contributed in an essential, direct and immediate way (whether by "real time" information or otherwise) to those countries' ability to shoot down civil aircraft. Moreover, our assistance has been of a type and extent that Colombia and Peru would have difficulty in providing for themselves or in obtaining from other sources. In the absence of changes in the policies and practices of Colombia and Peru, there is a very substantial danger that the USG activities described to us meet the purpose element of aiding and abetting.

**3. Acts of assistance.** The application of the third element to the question we are considering is, we think, fairly straightforward. As the Supreme Court recently reiterated, aiding and abetting "'comprehends all assistance rendered by words, acts, encouragement, support, or presence.'" *Reves v. Ernst & Young*, 507 U.S. 170, 178 (1993) (quoting *Black's Law Dictionary* 68 (6th ed. 1990)). Gauged by this definition, many or most forms of USG activities that have been described

---

[20] In general, USG information-sharing and other forms of assistance to foreign nations do not implicate the United States in those nations' actions because, among other reasons, the purpose element of aiding and abetting is not met. However important USG aid may be as an overall matter, the provision of information, resources, training, and support to a foreign nation would not in itself provide a basis for concluding that the United States intended to facilitate that nation's unlawful actions Indeed, the general nature of such aid and its legitimate purposes (the furtherance of the diplomatic, national security, and democratization goals of USG foreign policy) rebut any assertion that its purpose is to support the occasional or unexpected unlawful acts of recipient governments. *See generally United States v Pino-Perez*, 870 F 2d 1230, 1237 (7th Cir.) (en banc) (aiding and abetting requires "a fuller engagement with [the primary actor's] activities" than accidental or isolated assistance creates), *cert denied*, 493 U.S. 901 (1989)

to us could be fairly described as "act[s] of helping" Colombia or Peru to carry out a shootdown policy. That conclusion, when combined with our analysis of the knowledge and purpose elements, leads us to think that there is grave risk that the described USG activities contravene 18 U.S.C. § 32(b)(2).

## C.

It has been suggested that the problems for USG information-sharing and other assistance to Colombia and Peru that are posed by 18 U.S.C. §§ 2(a) and 32(b) might be eliminated by seeking assurances from the governments of those countries with respect to their shootdown activities. Two possible forms of such an assurance have been posited: an assurance that Colombia and Peru would engage in no more shootdowns of civil aircraft, or an assurance that Colombia and Peru would make no use of information (or other aid) provided by the United States in effecting shootdowns. The argument would be that such assurances would negate either the first, knowledge element, or the second, purpose prong of aiding and abetting.

An initial point applies to both forms of assurance: to be of any legal significance, an assurance must be made by an official of the other government with authority to bind that government, and it must be deemed reliable by a high officer of the United States, acting with full knowledge of the relevant facts and circumstances. Assurances from subordinate officials could not reasonably be taken to represent a position that would be adhered to by other officials of that government. The acceptance of assurances that were not deemed credible *in fact* by USG officials might readily be characterized as a "deliberate effort to avoid [the] knowledge," *Giovannetti*, 919 F.2d at 1229, that the assurance did not represent the actual intentions of the other government. In light of the gravity of the issue, the decision to accept and act on such an assurance would be a policy decision of such significance that it could be appropriately made only by a very high officer of this Government.

A reliable assurance (as we have defined it) that the foreign government would carry out *no* shootdowns falling within the prohibition of § 32(b)(2) would, in our opinion, clearly negate the knowledge element of aiding and abetting. With such an assurance, there would be no known or suspected intention to effect unlawful shootdowns for USG officials to have knowledge of; put another way, the acceptance of such an assurance as reliable would constitute a judgment that the foreign government was engaged in no criminal activity in this respect. If it subsequently became apparent that this judgment was mistaken, a reevaluation of the legal status of USG assistance would be necessary, but until and if evidence emerged that the other government intended to violate its assurance, USG aid of all sorts, including the provision of real-time flight information, would be lawful. For similar reasons, a reliable assurance that the foreign government would

not carry out any unlawful shootdowns would eliminate any argument that USG officials had a "desire to help the activity succeed," *Carson*, 9 F.3d at 586, because it would represent a judgment that no unlawful activity was contemplated or under way.

A more problematic case is posed if the foreign government declined to renounce its shootdown policy but offered assurances that it would not use USG-supplied information or other assistance in carrying out shootdowns violating § 32(b)(2). (In such a case, the foreign government might carry out such activities using information or assistance obtained from other sources.) A bare assurance to that effect, without more, would be insufficient to remove the risk of contravening the statute, given what we understand to be the widespread use of USG-supplied information, the commingling of USG and foreign government information, and the temptation on the part of the foreign government's operational officers to make use of information or assistance extremely valuable to effecting their own government's law enforcement program.

We believe that there are conditions in which such assurances would be sufficiently reliable to permit the United States to continue to provide information and assistance to a foreign country's antinarcotics program even if that country declined to renounce its shootdown policy. First, the United States and the foreign country should agree that the sole purpose for which USG information and other assistance would be provided and used was to assist in the execution of a ground-based end game (searches, seizures and arrests), and that such information and assistance would not be used to target civil aircraft for destruction. Second, the agreement should establish mechanisms by which USG personnel would obtain detailed and specific knowledge as to how the USG-provided information and assistance were in fact being used, and thus be able to identify at an operational level any instances of non-compliance with the agreement. Third, the agreement should stipulate that if any incident should occur in which the foreign government's agents fired on a civil aircraft, USG personnel would be able to verify whether USG-provided information and assistance had been used in that instance, or whether the foreign country had employed only information and assistance from other sources in carrying out that operation. Finally, the agreement should provide for the termination of USG-supplied information and assistance in the event of material non-compliance. Were it possible to reach an agreement that incorporated such safeguards, we believe that it would insulate USG personnel from liability in the event the foreign government destroyed a civil aircraft.

## III.

United States aid to Colombia and Peru might also implicate USG personnel in those governments' shootdown policies on a conspiracy rationale. *See* 18 U.S.C.

§ 371. The concept of conspiracy is distinct from that of aiding and abetting.[21] Aiding and abetting liability does not depend on an actual agreement between the primary actor and the aider and abettor.[22] In contrast, "agreement remains the essential element of the crime, and serves to distinguish conspiracy from aiding and abetting which, although often based on agreement, does not require proof of that fact." *Iannelli v. United States*, 420 U.S. 770, 777 n.10 (1975). In addition, liability for participation in a conspiracy may attach to someone even though he or she provides no material assistance toward the conspiracy's goals, and even if the primary criminal activity that is the object of the conspiracy never takes place. *See, e.g., United States v. Townsend*, 924 F.2d 1385, 1399 (7th Cir. 1991).[23] USG activities — including information-sharing and technical advice — that would be of material assistance in effecting shootdowns do not in themselves constitute an agreement between USG personnel and others to carry out shootdowns, but as we understand the facts the following are both true. (1) The United States intends, and has agreed with the governments of Colombia and Peru, to bolster the antinarcotics law enforcement activities of those countries. (2) The governments of Colombia (expressly) and Peru (in practice) regard shootdowns as an integral part of their antinarcotics law enforcement activities. In those circumstances, courts might well view the distinction between USG assistance to their antinarcotics programs generally and USG assistance to the shootdown component of those programs as thin or non-existent, and thus construe ongoing USG assistance as evidence of an agreement. *See United States v. Lechuga*, 994 F.2d 346, 350 (7th Cir.) (en banc), *cert. denied*, 510 U.S. 982 (1993).

We believe that it is imperative to make this Government's disapproval of shootdowns in violation of § 32(b) clear in order to eliminate any suggestion that

---

[21] In this memorandum, we focus on the potential for aiding and abetting liability for two reasons First, it is unclear that under the circumstances outlined to us the relationship between the activities of USG personnel and shootdown actions by foreign governments could reasonably be deemed an "agreement" to violate 18 U S C § 32(b)(2) A lesser degree of association with a criminal venture suffices to create aiding and abetting liability, however, and we think that a more serious argument can be made that some forms of USG assistance could fall within the definition of aiding and abetting *See United States v Cowart*, 595 F 2d 1023, 1031 (5th Cir 1979) (the "'community of unlawful intent'" present in aiding and abetting, although "similar to the 'agreement' upon which the crime of conspiracy is based, does not rise to the level of 'agreement'") In addition, and vitally, as stated in the text we believe the risk that USG personnel might plausibly be viewed as conspirators can and should be eliminated by the communication to foreign governments and USG operational personnel of the United States's firm opposition to any shootdowns of civil aircraft contrary to § 32(b)(2) or international law.

[22] The Seventh Circuit recently hypothesized a case illustrating this point.

> Suppose someone who admired criminals and hated the police learned that the police were planning a raid on a drug ring, and, hoping to foil the raid and assure the success of the ring, warned its members — with whom he had no previous, or for that matter subsequent, dealings — of the impending raid He would be an aider and abettor of the drug conspiracy, but not a member of it

*Carson*, 9 F 3d at 586 (quoting *Zafiro*, 945 F.2d at 884)

[23] Thus, USG personnel theoretically could be liable for conspiracy if their actions were construed as constituting an agreement with officials of the foreign government to carry out shootdowns and if the latter took some overt action toward accomplishing a shootdown It would be unnecessary under the law of conspiracy for a shootdown to take place or for any USG actions actually to contribute to a shootdown

USG personnel have entered into a conspiratorial agreement with foreign officials involving unlawful shootdowns since liability as a conspirator attaches even if the substantive unlawful act never takes place. In addition, we think that USG agencies should specifically instruct their personnel not to enter into any agreements or arrangements with the officials or agents of foreign governments that encourage or condone shootdowns. *See generally Iannelli*, 420 U.S. at 777-79.

## IV.

This case is characterized by a combination of factors: it involves a criminal statute that explicitly has extraterritorial reach, that is applicable to foreign government military and police personnel, and that defines a very serious offense. Moreover, our government is fully engaged in furnishing direct and substantial assistance that is not otherwise available to the foreign nations involved, and at least some of the USG personnel who provide that assistance have actual knowledge that it is likely to be used in committing violations.

Given this combination of factors, we conclude that, in the absence of reliable assurances in the sense defined above, USG agencies and personnel may not provide information (whether "real-time" or other) or other USG assistance (including training and equipment) to Colombia or Peru in circumstances in which there is a reasonably foreseeable possibility that such information or assistance will be used in shooting down civil aircraft, including aircraft suspected of drug trafficking.

Furthermore, we note that § 32(b)(2) prohibits the destruction of civil aircraft "while such aircraft is *in service*," as well as "damage to such an aircraft which renders that aircraft incapable of flight" (emphasis added). The statute defines "[i]n services" to "mean[] any time from the beginning of preflight preparation of the aircraft by ground personnel or by the crew for a specific flight until twenty-four hours after any landing." 18 U.S.C. § 31. Thus, USG assistance for certain operations against aircraft *on the ground* may come within the statutory prohibitions. Section 32(b)(2) does not preclude ordinary law enforcement operations directed at a plane's crew or cargo during those times.[24] It does, however, appear to forbid airborne law enforcers to bomb or strafe a suspect plane that has landed or that is preparing to take off[25]

---

[24] For example, nothing in the section forbids the police to order the crew of a suspected drug trafficking plane to surrender upon landing, or to search or seize the plane or its cargo (Consequential damage to the aircraft would not constitute a violation of the statute ) Nor does the section forbid the police to use deadly force against a plane if they are themselves endangered by its crew's armed resistance to their legitimate orders The police may also use force to rescue any hostages held aboard the plane.

[25] A valid law enforcement operation intended to seize a pane on the ground and arrest its crew and an attack on the airplane itself in violation of § 32(b)(2) may both result in the disabling or destruction of the aircraft. No liability under the section would attach, either to primary actors or to those who assist them, in the former circumstance. As described to us, however, the Colombian and Peruvian counternarcotics programs each encompass (potential) actions that would intentionally fall within the latter, forbidden category Obviously, on different facts we could reach a different conclusion

We will be pleased to cooperate with legal counsel for other agencies in evaluating specific programs or forms of aid under that standard.

## V.

Our conclusions here must not be exaggerated. We have been asked a specific question about particular forms of USG assistance to the Colombian and Peruvian aerial interdiction programs. The application of the legal standard described here to any other USG programs — including other programs designed to benefit Colombia or Peru — will require careful, fact-sensitive analysis. We see no need to modify USG programs whose connection to those governments' shootdown policies is remote and attenuated, and (as noted above) we perceive no implications for USG assistance to any other foreign country unless another government adopts a policy of shooting down civil aircraft.

Other limitations on our conclusions should be noted. In certain circumstances, USG personnel may employ deadly force against civil aircraft without subjecting themselves to liability under § 32(b)(2). "The act is a criminal statute, and therefore must be construed strictly, 'lest those be brought within its reach who are not clearly included.'"[26] Although these circumstances are extremely limited, they may in fact arise.

Specifically, we believe that the section would not apply to the actions of United States military forces acting on behalf of the United States during a state of hostilities.[27] As discussed above, § 32(b)(2) was intended to implement the United States's obligations under the Montréal Convention. That Convention does not appear to apply to acts of armed forces that are otherwise governed by the laws of armed conflict.[28] (The general rule under the law of armed conflict is that civil

---

[26] *Export Sales of Agricultural Commodities to Soviet Union and Eastern European Bloc Countries*, 42 Op. Att'y Gen. 229, 232 (1963) (quoting *United States ex rel Marcus v Hess*, 317 U.S. 537, 542 (1943))

[27] We do not mean to confine a "state of hostilities" to some specific legal category, such as a state of declared war in the constitutional sense, *see* U S Const. art I, § 8, cl. 11, or a situation such as to trigger the reporting requirements of the War Powers Resolution, *see* 50 U S C § 1543(a)

[28] International agreements such as the Montréal Convention are generally concluded with a view to regulating ordinary, peace-time conditions. Accordingly, one treatise writer has stated it to be the general rule that "'[i]f, as the result of a war, a neutral or belligerent State is faced with the necessity of taking extraordinary measures temporarily affecting the application of such conventions in order to protect its neutrality or for the purposes of national defence, it is entitled to do so even if no express reservations are made in the convention.'" Bin Cheng, *The Law of International Air Transport* 483 (1962) (quoting *The S S Wimbledon* (Gr Brit et al v Germ.), 1923 P C I J (ser. A) No 1, at 36 (Aug. 17) (dissenting opinion of Judges Anzilotti and Huber)) *Accord* Preliminary Objections Submitted by the United States of America, *Case Concerning the Aerial Incident of 3 July 1988 (Islamic Republic of Iran v United States of America)* at 200, 203 (Mar 4, 1991) ("the Montreal Convention was intended to prevent and deter saboteurs and terrorists from unlawfully interfering with civil aviation and endangering innocent lives The drafters of the Convention did not discuss the actions of military forces acting on behalf of a State during hostilities, and there is no reason to believe that they intended the Convention to extend to such actions . . . Infringements on the laws of armed conflict through international agreements primarily addressing situations other than armed conflict are not to be presumed. There is no indication that the drafters of the Montreal Convention intended it to apply to military forces acting in armed conflict. If they had so intended, they would have had to address a myriad of issues relating to acts by military forces.' ) This conclusion is corroborated by article 89 of the

aircraft are immune from attack unless they are being used for military purposes or pose an immediate military threat.[29]) We do not think that § 32(b)(2) should be construed to have the surprising and almost certainly unintended effect of criminalizing actions by military personnel that are lawful under international law and the laws of armed conflict. We note specifically that the application of § 32(b)(2) to acts of United States military personnel in a state of hostilities could readily lead to absurdities: for example, it could mean in some circumstances that military personnel would not be able to engage in reasonable self-defense without subjecting themselves to the risk of criminal prosecution. Unless Congress by a clear and unequivocal statement declares otherwise, § 32(b)(2) should be construed to avoid such outcomes.[30] Thus, we do not think the statute, as written, should apply to such incidents as the downing on July 3, 1988 of Iran Air Flight 655 by the United States Navy cruiser *Vincennes*.[31]

Furthermore, even in cases in which the laws of armed conflict are inapplicable, we believe that a USG officer or employee may use deadly force against civil aircraft without violating § 32(b)(2) if he or she reasonably believes that the aircraft poses a threat of serious physical harm to the officer or employee or to another person.[32] A situation of this kind could arise, for example, if an aircraft suspected of narcotics trafficking began firing on, or attempted to ram, a law enforcement aircraft that was tracking it. Assuming that such aggressive actions posed a direct and immediate threat to the lives of USG personnel or of others aboard the tracking

---

Chicago Convention, which declares in part that "[i]n case of war, the provisions of this Convention shall not affect the freedom of action of any of the contracting States affected, whether as belligerents or as neutrals " *See* David K. Linnan, *Iran Air Flight 655 and Beyond: Free Passage, Mistaken Self-Defense, and State Responsibility*, 16 Yale J Int'l L 245, 267 (1991) ("the nature of the Montreal Convention as an anti-hijacking and sabotage treaty seems to preclude its application to the acts of armed forces governed by the law of armed conflict under article 89 of the Chicago Convention") *See also* 7 Green Hackworth, *Digest of International Law* 552-55 (1943) (describing earlier practice and theory).

[29] *See* Department of the Air Force, *International Law — The Conduct of Armed Conflict and Air Operations*, ¶ 4-3(a)(1), (b) (1976); Stokdyk, Comment, *Airborne Drug Trafficking Deterrence· Can a Shootdown Policy Fly?*, *supra* note 6, at 1321

[30] *Cf. United States v. Kirby*, 74 U S. (7 Wall ) 482, 486-87 (1869) (holding that statute punishing obstruction of mail did not apply to temporary detention of mail caused by carrier's arrest for murder); *Nardone v United States*, 302 U.S. 379, 384 (1937) (public officers may be implicitly excluded from statutory language embracing all persons because "a reading which would include such officers would work obvious absurdity as, for example, the application of a speed law to a policeman pursuing a criminal or the driver of a fire engine responding to an alarm").

[31] *See* Marian Nash Leich, *Denial of Liability. Ex Gratia Compensation on a Humanitarian Basis*, 83 Am. J. Int'l L. 319, 321-22 (1989) (quoting Congressional testimony of State Department Legal Adviser Sofaer that "[i]n the case of the Iran Air incident, the damage caused in firing upon #655 was incidental to the lawful use of force   The commander of the U.S S. *Vincennes* evidently believed that his ship was under imminent threat of attack from a hostile aircraft, and he attempted repeatedly to identify or contact the aircraft before taking defensive action   Therefore, the United States does not accept legal responsibility for this incident . .  ").

[32] *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (discussing constitutionally reasonable use of deadly force); *New Orleans and Northeastern R R v. Jopes*, 142 U.S. 18, 23 (1891) ("the law of self-defence justifies an act done in honest and reasonable belief of immediate danger").

aircraft, and that no reasonably safe alternative would dispel that threat, we believe that the use of such force would not constitute a violation of § 32(b)(2).[33]

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[31] To the extent that § 32(b)(2) does not apply to the use of deadly force by USG military or other personnel in the circumstances described above, it would of necessity be inapplicable as well to the actions of similarly situated personnel of the Colombian or Peruvian governments That is, such foreign governmental agents could employ deadly force against civilian aircraft in the same circumstances in which USG personnel were able to do so USG personnel who assisted foreign government agents in such lawful and legitimate acts of self-defense would of course not be subject to liability, since one cannot be prosecuted for aiding and abetting the commission of an act that is not itself a crime. *See Shuttlesworth v. City of Birmingham*, 373 U S. 262 (1963)